UNITED STATES BANKRUPTCY COURT       **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                            Chapter 11

MARKETXT HOLDINGS CORP.,        Case No. 04-12078 (ALG)

                     Debtor.

-------------------------------------------------------------x

ALAN NISSELSON, as Chapter 11 Trustee of
MarketXT Holdings Corp., and the Official
Committee of Unsecured Creditors,

                     Plaintiffs,

        - against -

EMPYREAN INVESTMENT FUND, L.P.,
EMPYREAN GENERAL PARTNER, LLC, ASH
MASTER FUND, II, LLC, ASH MASTER
FUND II, L.P., ASH FUND LP f/k/a EMPYREAN        Adv. No. 05-01268 (ALG)
FUND, LP, ASH FUND II LP, ASH CAPITAL,
LLC f/k/a, ASH CAPITAL MANAGEMENT, ASH
GENERAL PARTNER, LLC, ASH OFFSHORE
FUND, LTD., ASH GENERAL PARTNER
OFFSHORE, LTD., RAUF ASHRAF, and JOHN
DOES 1 THROUGH 10,

                     Defendants.

-------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

BRAUNER BARON ROSENZWEIG & KLEIN, LLP
Attorneys for Alan Nisselson, Chapter 11 Trustee, Plaintiff
      By: Howard L. Simon
61 Broadway, 18th Floor
New York, New York 10006

KAYE SCHOLER LLP
Attorneys for the Official Committee of Unsecured Creditors, Plaintiff
        By: Lester M. Kirshenbaum
             Margarita Y. Ginzburg
             Dina Rovner
425 Park Avenue
New York, New York 10022

J.L. SAFFER, P.C.
Attorneys for Defendants
        By: Jennifer L. Saffer
20 Vesey Street, 7th Floor
New York, New York 10007


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**


        The Court has consolidated for decision three motions by the Chapter 11 Trustee

(the "Trustee") of MarketXT Holdings, Inc. (the "Debtor") and its Official Creditors

Committee (the "Creditors Committee"), and one motion by the Defendants in the above-

captioned adversary proceeding.  The Trustee's first motion seeks to hold Rauf Ashraf

("Ashraf"), the principal of Empyrean Investment Fund, LP ("EIF"), in contempt of an

order of this Court and to enforce the Defendants' agreement to hold certain funds in

escrow.[1]  The Trustee's second motion seeks to consolidate the preliminary hearing on

Plaintiffs' motion for a preliminary injunction with the final hearing with respect to (i) all

of the Trustee's claims against Defendants EIF and Empyrean General Partner, LLC

("EGP"), and (ii) the Trustee's equitable claims against the remaining Defendants, while

severing any remaining claims for a separate trial should such a trial prove necessary.

---

[1] In addition to Ashraf and EIF, the other defendants are hedge funds that Ashraf controls, including
Empyrean General Partner, LLC, Ash Master Fund, II, LLC, Ash Master Fund II, L.P., Ash Fund LP f/k/a
Empyrean Fund, LP, Ash Fund II LP, Ash Capital, LLC f/k/a Ash Capital Management, Ash General
Partner, LLC, Ash Offshore Fund, Ltd., and Ash General Partner Offshore, Ltd. (collectively with Ashraf
and EIF, the "Defendants").  The motion by the Trustee seeks to hold Ashraf in contempt and to require all
of the Defendants to replenish the dissipated funds.

The Trustee's third motion, pursuant to Fed. R. Civ. P. 21 made applicable through Rule 7021 of the Bankruptcy Rules, seeks to amend the complaint in this adversary proceeding to add as defendants Ash Market Neutral Fund, Ltd. ("AMNF"), Ash Fund, LP, formerly known as Empyrean Investment Fund, LP ("AF"), and Empyrean Fund, LP ("EFLP").

The Defendants' motion, pursuant to Fed. R. Civ. P. 60(b) and 65(b), made applicable through Bankruptcy Rules 9024 and 7060, seeks to clarify or modify a prior order of the Court and (i) allow Ashraf "to actively manage" the funds held in escrow and (ii) permit the Defendants to pay reasonable professional fees and expenses in connection with the litigation as well as the contractual management fees that have accrued since the commencement of this litigation.

The facts found hereafter were adduced in part over 12 days of hearings in connection with the Trustee's motion for a preliminary injunction. Since the Defendants have not completed their case on the motion for a preliminary injunction, they were given a full opportunity to introduce all the evidence they deemed relevant to the contempt motion, as well as other motions that are decided hereby. The findings and conclusions made hereafter will apply only to the instant motions, as to which the record is complete. Based on that record, the Court makes the following findings of fact and conclusions of law.

### Background

The Debtor is a corporation, once known as Tradescape Corp. and later T Corp., owned and operated by Omar Amanat ("Amanat") and members of his family. The Debtor developed and at one time apparently had great success with an electronic system for trading securities. On June 3, 2002, it entered into a transaction with E*Trade

Financial Corp. ("E*Trade"), pursuant to which it sold its wholly-owned subsidiary,

Momentum Securities, LLC ("Momentum"), to E*Trade for 11,750,000 shares of

E*Trade stock (originally calculated to have a market value of $100 million) and a

potential additional $180 million in E*Trade stock if Momentum thereafter achieved

certain defined annual revenue thresholds (the "Earn Out"). Of the 11,750,000 shares of

E*Trade stock received, the Debtor placed approximately 2.4 million shares in escrow for

possible claims against Momentum. The remaining 9,400,000 shares (the "Non-Escrow

E*Trade Stock") were subject to contractual and securities law restrictions limiting the

Debtor's ability to dispose of the stock without registration and/or without E*Trade's

consent and cooperation. As a practical matter, this made it difficult if not impossible for

the Debtor to liquidate the shares at a time when it was under increasing pressure from its

creditors to raise cash (and when it appears that the market price of E*Trade shares was

falling).

     The record shows that the Debtor made numerous efforts to liquidate the Non-

Escrow E*Trade Stock.[2] Eventually, the Debtor negotiated a transaction with affiliates of

Bank of America (collectively, "B of A") with respect to a disposition of the stock. It

was in connection with this transaction that Amanat enlisted the aid of Ashraf, who was

just embarking on his own as a founder and prospective manager of a group of hedge

funds in Boston.[3] As the deal was structured, EIF would act as a middleman between the

Debtor and B of A, for at least part of the transaction, advancing to the Debtor the

---

[2] Suits and countersuits relating to the sale and the Earn Out are pending between the Debtor, Amanat (who
is in his own Chapter 7 case) and E*Trade. The Debtor asserts that E*Trade not only subverted its efforts
to liquidate the E*Trade stock, but that it wrongfully prevented the Debtor from obtaining any part of the
Earn Out. E*Trade contends that it was defrauded in connection with the sale.

[3] It appears that as of the time of the B of A transactions, Ashraf had no other clients for his hedge funds;
Amanat apparently later introduced him to one or more clients. The extent of Ashraf's business as a hedge
fund manager is, as of the record to date, uncertain.

proceeds to be obtained from B of A, obtaining a pledge of the stock in return, and placing the stock with B of A for sale or other disposition.

At a critical stage of the transaction, on March 28, 2003, a telephone call took place between representatives of E*Trade, the Debtor and Ashraf regarding the transaction. E*Trade appears to have disparaged Amanat in this conversation, after which Amanat and Ashraf apparently agreed to raise the interest rate payable on the loan from EIF to the Debtor from 8% with a one-year term to 19% with a four-year term and a 19% prepayment penalty. The parties hotly contest whether Ashraf was acting at arms length. The Defendants claim that Ashraf and Amanat had a business relationship as independent parties, and that the more onerous terms of the transaction reflected Ashraf's understanding of the risks as a consequence of the phone call on March 28, 2003. The Trustee has adduced evidence that Amanat was separately e-mailing Ashraf during the phone call, giving him advice on how to deal with the E*Trade principals. (Tr. Hr'g on July 15, 2005 at 106-07.) Earlier that day, the Trustee asserts that Amanat had given Ashraf the advice, "you have to start sounding panicky" when speaking to E*Trade's representatives. (Tr. Hr'g on July 15, 2005 at 129-30 and E-mail dated March 28, 2003, Pls. Ex. 173.)

The following were the material elements of the transactions among the Debtor, EIF and B of A:

1. On March 28, 2003, the Debtor pledged to EIF the 9,400,000 shares of Non-Escrow E*Trade Stock (the "Pledge Agreement"). In return, EIF agreed to advance to the Debtor up to $17,200,000 (50% of the then market value of the pledged shares)

payable only from the proceeds of the sale or other disposition of the stock itself.[4]  The

note evidencing the EIF advances (the "Note") bore interest at the non-default rate of

19% per annum and had a four-year term, with a prepayment penalty equal to 19% over

the life of the loan if the Debtor paid down any of the advances prior to maturity.  The

Trustee alleges that in practical terms, by virtue of the prepayment penalty, EIF became

entitled to nearly 100% of the face amount of the proceeds of the stock.  (Pls. Compl. at

8.)

    2.  On or about April 9, 2003, EIF and B of A consummated a "STARS" Variable

Share Prepaid Forward Contract, in which EIF transferred 6,746,168 of the shares of the

stock to B of A for $27,435,933.30 (the so-called "STARS transaction").  B of A

undertook to liquidate the shares, retaining for itself the benefit of any appreciation in the

value of the shares.  As agreed, the proceeds of this transaction were distributed as

follows: EIF paid $12,000,000 to Softbank Finance Corporation and one of its affiliates

(collectively, "Softbank"), major creditors of the Debtor, and about $658,000 to other

creditors.  EIF kept the balance, transferring it into accounts held by the Defendants

and/or other Ashraf-controlled entities.[5]

    3.  About a month later, in early May 2003, the Debtor and B of A entered into a

second transaction pursuant to which the Debtor sold the remaining 2,400,000 shares of

the Non-Escrow E*Trade Stock directly to B of A for $14,600,000 (the so-called "Collar

---

[4] In structuring the transaction in this manner, the Trustee alleges that EIF could fund the loan transaction using virtually no funds of its own and taking on minimal, if any, financial exposure.  (Pls. Compl. at 2.)

[5] It is so alleged in the complaint in this adversary proceeding.  (Pls. Compl. at 9.)  Softbank, a creditor of the Debtor, allegedly had entered into an earlier settlement with the Debtor of litigation involving debts allegedly due from the Debtor to Softbank.  The settlement allegedly included both the Debtor's acknowledgment of debt and other obligations owing to Softbank of approximately $33 million and the Debtor's agreement to fund the settlement by borrowing against a pledge of some portion of the Non-Escrow E*Trade Stock.  (Pls. Compl. at 7.)

6

transaction"). [6]  Unlike the STARS transaction, EIF was not a party, but it received most of the consideration.  From the more than $14,000,000 in proceeds, the Debtor received an amount slightly in excess of $200,000 to pay its expenses, B of A received approximately $400,000, and EIF received the balance, apparently as a "prepayment" of its advances to the Debtor pursuant to the Note.  In all, EIF has contended that this "prepayment" plus the Debtor's repayment of $1,700,000 on June 16, 2003 gave rise to a "prepayment penalty" in excess of $10 million under the Note.

The Complaint in this adversary proceeding alleges that the net effect of the foregoing and certain related transactions was as follows: The Debtor originally possessed Non-Escrow E*Trade Stock with a current market value of $40 million and a liability to Softbank under the Softbank Settlement.  Afterwards, the Debtor held no Non-Escrow E*Trade Stock.  Its obligation to Softbank was reduced by $12 million, but it had a new obligation to EIF of approximately $15 million bearing a higher interest rate than the Softbank debt.  EIF, on the other hand, while advancing no money of its own in any of the transactions, now had approximately $30 million in cash, as well as a claim against the Debtor for approximately $15 million. [7]

Notwithstanding some payments made to creditors as a result of the foregoing transactions, the Debtor remained beset by financial problems.  On March 26, 2004, an involuntary case was commenced against it under Chapter 7 of the Bankruptcy Code. Eventually, the Debtor filed a motion to convert the involuntary case to a voluntary case under Chapter 11, and an order granting the motion was entered on December 2, 2004.

---

[6] Defendants claimed, in papers filed in an earlier stage of this adversary proceeding, that the amount was $14,200,000.  (Defs. Mot. &  Mem. of Law for an Order Staying the Adv. Proc., dated April 8, 2005, at 14.)

[7] It is emphasized that the hearing in respect of the Plaintiffs' allegations in the Complaint has not yet concluded and that the Defendants hotly dispute the allegations of the Complaint.

On December 16, 2004, the United States Trustee appointed the Creditors Committee, and Alan Nisselson was appointed to serve as the Chapter 11 Trustee on January 28, 2005. Thereafter, the Trustee took discovery pursuant to Bankruptcy Rule 2004, including the deposition of Ashraf, which took place on February 16, 2005.

On March 17, 2005, the Trustee commenced this adversary proceeding, claiming that the Debtor had been insolvent at the time of the transaction with EIF and had not received reasonably equivalent value from EIF or that, alternatively, the transaction was intentionally designed to hinder, delay or defraud the Debtor's creditors. The Complaint also includes claims of breach of contract, that the transactions were avoidable preferences and that the Defendants' claims, if any, should be equitably subordinated or disallowed. Along with the Complaint, the Trustee filed a motion for a preliminary injunction, seeking to restrain some $16 million that was allegedly traceable to the STARS and Collar transactions and still in the possession of the Defendants. In connection with the motion, the Trustee moved for a temporary restraining order providing for substantially the same relief as the preliminary injunction. A hearing was held on the motion for a TRO on March 18, 2005 (the "March 18 Hearing").

Defendants appeared at the March 18 Hearing represented by Joseph R. Sahid of the Law Offices of Joseph R. Sahid, who had previously represented Ashraf in the Rule 2004 discovery process, and by an experienced bankruptcy attorney, David Wander ("Wander").[8] The Court was informed at the hearing that the parties had engaged in extensive negotiations the day before and had agreed to a resolution of the TRO motion. Pursuant to the parties' agreement, restraints would be placed on three accounts that held

---

[8] Ashraf had also been represented in the 2004 discovery proceedings by Abid R. Qureshi of Latham & Watkins LLP, who did not make an appearance at the March 18 Hearing.

funds traceable to the proceeds of the STARS and Collar transactions: an account of the

"Ash Market Neutral Fund," which appeared at the time to be located in the Cayman

Islands and which held proceeds of approximately $13 million, and accounts held by the

Defendants at Bank of America and Sovereign Bank containing an aggregate of

approximately $3 million.  The Trustee read the following into the record:

> Defendants have agreed that they shall not transfer, withdraw, encumber
> or grant to any person or entity any interest in any of the funds or other
> property held in these accounts without prior notice in writing to the
> Trustee on at least ten business days' notice, which shall include, in
> reasonable detail, a description of the amount of the proposed transfer, the
> name, address and relationship to Defendants of the proposed transferee
> and the purpose of the proposed transfer.  If the Trustee shall not agree to
> any transfer, the Defendants will have the burden of coming to court for a
> court order on notice.

(Tr. H'rg on March 18, 2005 at 6.)  The Defendants expressly agreed to this restraint on

the record of the March 18 Hearing, and no party has disputed the agreement (hereinafter,

the "Stipulation") restraining $16 million in the three bank accounts (called hereafter the

"Restrained Funds").

     The dispute on this motion has focused on whether there was an agreed exception

to the agreement providing that the Defendants could withdraw monies freely from the

Restrained Funds to "pay taxes."  The issue has been complicated by errors in the

transcript of that portion of the hearing in which Ashraf's counsel, Wander, after

concurring with what the Trustee's counsel had placed on the record, raised the issue of

"paying taxes."  There is now no question that the first transcript of the record incorrectly

recorded the colloquy, particularly by omitting the word "always" from the Court's

interjection.  The Court Reporter corrected the passage to read as follows:

> MR. WANDER:        Well, just so the record's clear, what we've
> agreed is, if there's a reason to spend money for taxes - -

| | |
|---|---|
| THE COURT: | Well, you can always - - |
| MR. WANDER: | - - for fees - - |
| THE COURT: | You can always - - |
| MR. WANDER: | - - they simply agree, and then we don't |

need a court order.

| | |
|---|---|
| THE COURT: | That's fine. |
| MR. WANDER: | We only - - what we agreed is, if they don't |

disagree with the proposed expense, we have the burden of moving before
your Honor - -

| | |
|---|---|
| THE COURT: | I'm not - - |
| MR. WANDER: | - - but we don't need an order for an agreed- |

upon expense, withdrawal or transfer.

| | |
|---|---|
| THE COURT: | I'm not suggesting that the agreement |

should be amended.

(Tr. Hr'g on March 18, 2005 at 17) (corrected version).[9]

As discussed further below, the import of this colloquy has been the

subject of much dispute, and the Defendants have relied on the alleged ambiguity

---

[9] The initial transcript read as follows:

MR. WANDER:  Just so the record is clear, what we've agreed is, if there's reason to spend money for taxes --
THE COURT:      You can.
MR. WANDER:  -- they simply agree, and then we don't need a court order.
THE COURT:      That's fine.
MR. WANDER:  What we agreed is, if they don't disagree with the proposed expense, we have the burden of moving before Your Honor, but we don't need an order for an agreed-upon expense, withdrawal or transfer.
THE COURT:      I'm not suggesting that the agreement should be amended.
MR. WANDER:  Thank you, Your Honor.
(Tr. Hr'g on March 18, 2005 at 17.)

Ashraf's present counsel has supplied a further version of the Stipulation and Court Order, transcribed by Joyce G. Golden, an independent Court Reporter, from a recording of the hearing, as follows:

MR. WANDER:   Well, just so the record's clear, what we've agreed is if there is a reason to spend money, for taxes --
HON. ALLAN L. GROPPER:          You can always, you can always --
MR. WANDER:   -- they simply agree, and then we don't need a Court Order.
HON. ALLAN L. GROPPER:          That's correct.
MR. WANDER:   We only -- what we agreed is if they don't disagree with the proposed expense, we have the burden of moving before Your Honor.  But we don't need an order for an agreed-upon expense, withdrawal or transfer.
HON. ALLAN L. GROPPER:          I'm not suggesting that the agreement should be made.
MR. WANDER:   Thank you, Your Honor.
(Unofficial Tr. Hr'g on March 18, 2005 at 17-18.)

This version differs from the corrected version principally by changing the last word from "amended" to "made."  Having heard the recordings and spoken the words, the Court rejects this version.

in the initial transcript as a complete defense to the contempt motion.  In any

event, Ashraf's testimony is that he never read the transcript in any of its versions

until this motion for contempt was filed.  He testified that his sole communication

with counsel on the subject of taxes after the March 18 Hearing (which Ashraf did

not attend) consisted of a phone call at noon on March 18, 2005, in which Wander

allegedly told him that "the agreement that we came to was agreed to and read to

in the court, and was *business as usual*" (Tr. Hr'g August 24, 2005 at 83)

(emphasis added).  Ashraf was then asked, "And what did you understand that to

mean," to which he replied, "That taxes could be paid without notice or consent."

(Tr. Hr'g August 24, 2005 at 83.)

The Court so ordered the record on March 18, 2005 (the "Court Order"),

directing the parties to submit an appropriate writing memorializing the

Stipulation on escrowing the funds.  No such writing was submitted, however.

At the next hearing on April 1, 2005 (the "April Hearing"), the Defendants, now

represented by Michael Blumenthal of the firm of Brown Raysman Millstein Felder &

Steiner LLP,[10] explained that the parties had been unable to come to terms on the form of

a written order.  He then made the following statement on the record:

> We put on the record on March 18th that those funds would not be
> transferred or dissipated.  Mr. Ashraf is the sole person who can direct
> those funds.  And we agreed that they could not be transferred and that his
> Your Honor's order on March 18th would stay in effect.  What we were
> attempting to negotiate being that it's our position that these are [our]
> funds and not the trustee's funds are certain carve outs, for instance, taxes
> was, in fact, put on the record.  That there may be taxes due if there's a
> game [gain].  There may be taxes paid.  We didn't come to an agreement
> on those issues.  Frankly, my client's backed off and agreed to keep the
> March 18th order in place with respect to these funds.

---

[10] Brown Raysman Millstein Felder & Steiner LLP was substituted for David Wander in late March 2005.

11

(Tr. Hr'g April 1, 2005 at 41.)  Subsequent to this hearing, the Brown Raysman firm withdrew as counsel because of a conflict, but the next firm representing the Defendants, Todtman, Nacahmie, Spizz & Johns, P.C., confirmed that the March 18th agreement remained in place.[11]

Although the hearings were delayed as a result of the substitutions of counsel, the trial on the motion for a preliminary injunction began on June 21, 2005.  At about this time, the Trustee expressed increasing frustration that the Defendants had not provided any specific information about the status of the Restrained Funds.  During a telephonic hearing on July 7, 2005, the Court directed the Defendants to supply the Trustee with information regarding the Restrained Funds.  The Defendants then revealed that approximately $7 million had been removed from the escrow.

In his later testimony, Ashraf admitted that in late April and May, 2004, he had authorized transfers from the Restrained Funds and claimed that these payments were to pay taxes from gains realized in the 2003 transactions.  Ashraf had authorized payments of $300,000 for his personal tax liability and on May 5, 2005, had sent a check for $6.7 million to one Samee Bhatti ("Bhatti").  According to Ashraf, Bhatti, a resident of Canada, is a limited partner of Ash Master Fund II, which, in turn, is a limited partner of EIF.  Ashraf testified that he had concluded that Bhatti would have a large tax liability in Canada and that, without consulting or speaking to any of his attorneys or to the Trustee, he had sent a check for $6.7 million to Bhatti personally.  Ashraf's justification for acting on his own, without the advice of his counsel and without the approval of the Trustee or

---

[11] The Todtman, Nachamie firm appeared in May 13, 2005 and then withdrew for undisclosed reasons.  J.L. Saffer, P.C. was substituted for Todtman, Nacahmie on August 11, 2005.

the Court, was that he believed "the issue was brought up, agreed to, and resolved until this became an issue on the contempt hearing."  (Tr. Hr'g August 24, 2005 at 84.)

The Trustee brought a motion to hold Ashraf in contempt of court and to require the Defendants to replenish the Restrained Funds "in an amount not less than $6.7 million."  (Mot. for Contempt and Supplemental Relief at 2.)[12]  Ashraf defended on the ground that contempt could not be found because there was no proof of a clear and unambiguous Court Order.

Subsequently, to preserve the remaining balance of the Restrained Funds, the Court signed a temporary restraining order on July 22, 2005 (the "July 22nd Order"). That order freezes all of the assets in the Restrained Funds and restrains Ashraf, the remaining Defendants and the relevant brokers and banks from transferring, withdrawing or encumbering the Restrained Funds.  It is this Court order that the Defendants seek to clarify and modify in their motion.

In the meantime, hearings continued on the motion for a preliminary injunction as well as on the motion for an order of contempt.  The Trustee completed his case and then moved for an order consolidating the trial on his motion for a preliminary injunction with a final trial.  The Defendants objected, contending their rights to a trial by jury would be abridged and that the consolidation would be fundamentally unfair.  The Trustee later moved to join AMNF, AF and EFLP as defendants under Rule 21.  As stated above, the record is complete on contempt issues and the other motions but not on the motion for a preliminary injunction.

---

[12] Since the Trustee initially moved only for relief with respect to the $6.7 million paid to Bhatti, only this transfer will be considered hereafter.

## Discussion

### I. The Trustee's Motion for Contempt and Breach of an Agreed Stipulation

The principal disagreement between the parties on the motion for contempt relates to their characterization of the agreed Stipulation and Court Order. The Trustee's contention is that the Court Order, which encompassed and included the terms of the Stipulation, was clear and unambiguous and that *no* funds could be withdrawn from the Restrained Funds without either the Trustee's or the Court's express permission. Finding the Court Order to be clear and unambiguous, the Trustee contends that all the elements for a finding of civil contempt, discussed below, have been met. The Trustee also alludes to a breach of the Stipulation as a ground for recovering the withdrawn monies.

The Defendants respond that the agreed Stipulation and Court Order either contained a carve out allowing the withdrawal of monies for the payment of taxes or that, even if an express carve out did not exist, the language was sufficiently ambiguous to require denial of the motion for contempt.

For the reasons stated below, the Court finds that Ashraf violated the Stipulation and Court Order and his own agreement when he invaded the Restrained Funds and sent Bhatti $6.7 million without filing a motion for approval of the payment.

### A. The Trustee Has Satisfied the Three Elements of Civil Contempt

Because of its potency as a weapon, a contempt order cannot be issued where doubt exists as to the wrongfulness of the allegedly contemptuous conduct. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). A court may impose contempt sanctions against a party only if the movant proves the following: 1) the order which the contemnor violated was clear and unambiguous, 2) proof of noncompliance is clear and

14

convincing and 3) the contemnor has not diligently attempted to comply in a reasonable manner. *Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Cir. 2003), citing *King*, 65 F.3d at 1058.

The standards for an order of contempt are high. To meet the first prong for a finding of contempt, a movant must demonstrate that the order violated was clear and unambiguous. To be clear and unambiguous, an order must leave "no uncertainty in the minds of those to whom it is addressed." *King*, 65 F.3d at 1058, quoting *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir. 1988). The order must be "specific and definite enough" so as to delineate clearly the proscribed conduct. *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985). A court "may not impose obligations on a party that are not unambiguously mandated by the decree itself." *King*, 65 F.3d at 1058, quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971). Further, any ambiguities and omissions in the order are resolved to the benefit of the party charged with contempt. *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F.Supp.2d 281, 291 (S.D.N.Y. 2000). Nevertheless, if an order is alleged to be ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent, including the circumstances surrounding the formation of the decree." *King*, 65 F.3d at 1059, citing *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 574 (2d Cir. 1991).

To satisfy the second prong for a finding of contempt, a movant must demonstrate noncompliance by clear and convincing evidence. *Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 349 F.Supp.2d 509, 515 (E.D.N.Y. 2004). The clear and convincing standard "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation has occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)

(citations omitted); cf. *Perez*, 347 F.3d at 426. Finally, to satisfy the third and final prong for a finding of civil contempt, the movant must prove that the alleged contemnor has not diligently attempted to comply in a reasonable manner with the court's decree. In analyzing a respondent's diligence, courts "examine the defendant's actions and consider whether they are based on a good faith and reasonable interpretation of the court order." *Schmitz v. St. Regis Paper Co.*, 758 F.Supp. 922, 927 (S.D.N.Y. 1991).

Notwithstanding the need for clear and convincing evidence, in examining the good faith basis of an alleged contemnor's actions and whether the actions reasonably complied with a court order, the Court may engage in determinations of credibility. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F.Supp.2d 562, 566 (S.D.N.Y. 2001); *Bear U.S.A., Inc. v. Kim*, 71 F.Supp.2d 237, 248 (S.D.N.Y. 1999); *Sec. and Exch. Comm'n v. Am. Bd. of Trade, Inc. (In re Economou)*, 645 F.Supp. 1055, 1058-60 (S.D.N.Y. 1986). Moreover, once the moving party has provided sufficient proof of noncompliance by clear and convincing evidence, the burden shifts to the alleged contemnor to explain the noncompliance. *Sigety v. Abrams*, 632 F.2d 969, 974-75 (2d Cir. 1980); *Yalkowsky v. Yalkowsky*, 93 A.D.2d 834, 835, 461 N.Y.S.2d 54 (2d Dept. 1983). In *Sigety*, the Court held that the petitioner, who was found to be in civil contempt by a state court for failure to produce records pursuant to a subpoena duces tecum, had the burden of providing a reason for his noncompliance after the state had met its burden through the inference of continuing possession. 632 F.2d at 974-75; see also *Powers v. Powers*, 86 N.Y.2d 63, 69-70, 653 N.E.2d 1154, 629 N.Y.S.2d 984 (N.Y. 1995) ("The burden of going forward required respondent to offer some competent, credible evidence of his inability to make the required payments" in a contempt hearing for violation of a

support order.). However, shifting the burden from the movant to the alleged contemnor without proving the underlying noncompliance is impermissible. *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 251 (2d Cir. 2002).[13]

As mentioned above, the Defendants' principal argument is that the Stipulation put on the record and incorporated in the Court Order allowed the use of the proceeds of the Restrained Funds for the payment of "taxes" or was sufficiently ambiguous as to permit Ashraf to withdraw $6.7 million and send it to Bhatti in Canada. The Defendants particularly point to the three versions of the March 18th transcript that memorialized the agreed upon Stipulation and Court Order and argue that an order transcribed differently in three transcripts by two Court Reporters cannot be clear and unambiguous.

The fair reading of *any* of the March 18th transcripts is that if the Trustee agreed to payments for taxes from the Restrained Funds, a court order would not be necessary, but if the parties could not agree as to the spending for taxes, then the Defendants had to make a motion to the Court to allow the use of the money in the Restrained Funds. The Court's interjection of "you can always" in the corrected transcript is just that -- a recognition that a party can always bring a matter to the court and an interjection that in no way forms a declarative statement that amended the parties' agreement and permitted the Defendants to withdraw monies from the Restrained Funds at will for the payment of taxes. This is also true of the first version of the transcript, which all parties now agree was wrong.

---

[13] In *Levin*, the Second Circuit held, among other things, that the district court had erred in not holding the movant to its clear and convincing burden of showing noncompliance with a clear and unambiguous order. *Id*. at 251. The district court had instead allowed a burden shift to the alleged contemnor by finding that the alleged contemnor had "not presented credible evidence" that certain payments routed through various entities had "any purpose other than to evade the consent order." *Id*. at 251 (emphasis omitted). The Second Circuit went on to state that while no clear error occurred in finding the payments suspect, *that by itself*, did not sufficiently demonstrate the alleged contemnor's complicity in contempt. *Id*. (emphasis added).

The Defendants initially seized on the Court Reporter's transcription of the interjection in that transcript as "you can" as constituting an affirmative consent by the Court to the payment of taxes without the consent of the Trustee or a court order. Such a reading makes the remainder of Wander's statement nonsensical – these words speak to both parties' agreement as to use of the proceeds to pay taxes and in the absence thereof, the need for the Court to enter an order allowing withdrawal of money for payment of taxes.[14]

In any event, even if a prior ambiguity existed, it was cured on the record of the next hearing, which also took place well before Ashraf's payment to Bhatti. By the date of the next hearing, Wander had been replaced by the Brown, Raysman firm, whose partner, Michael Blumenthal, represented the Defendants. Blumenthal first described the March 18th Stipulation in the following words: "We put on the record on March 18 that those funds would not be transferred or dissipated." He then continued by acknowledging that the parties had continued to dispute the issue of tax payments and that his client had "backed off." Blumenthal stated:

> We put on the record on March 18th that those funds would not be transferred or dissipated. Mr. Ashraf is the sole person who can direct those funds. And we agreed that they could not be transferred and that his Your Honor's order on March 18th would stay in effect. What we were attempting to negotiate being that it's our position that these are [our]

---

[14] The Defendants argue that the Trustee failed to provide adequate notice of the hearing on the motion for contempt because, at the time of the motion, the only transcript of the record was incorrect, and thus, the Trustee should have provided additional notice to the Defendants upon the discovery of the corrected version. (See Defs. Post-Tr. Br. in Opp'n. to Mot. for Contempt at 21.) However, any version of a transcript is only a manifestation of the record itself. The motion for contempt was for violation of a court order, not violation of a version of a transcript containing the order. Moreover, in this case, upon learning of mistakes in the transcript, the Court re-opened the record, heard the tape of the March 18 Hearing, gave all parties a chance to cross-examine the Court reporter who had transcribed the record, admitted a version of the transcript brought forth by the Defendants along with the transcript corrected by the original Court reporter, and received post-trial briefs from both parties with regard to this issue. The Defendants had an opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

> funds and not the trustee's funds are certain carve outs, for instance, taxes
> was, in fact, put on the record. That there may be taxes due if there's a
> game [gain]. There may be taxes paid. We didn't come to an agreement
> on those issues. Frankly, my client's backed off and agreed to keep the
> March 18th order in place with respect to these funds.

(Tr. Hr'g April 1, 2005 at 41.) This representation was an unconditional commitment to

bring the issue of payment of taxes to the Court for resolution if the Trustee did not agree

to the withdrawal. Blumenthal represented Ashraf as his lawyer and agent, and Ashraf is

bound by Blumenthal's commitments to the Court. See *Omega Eng'g, Inc. v. Omega,*

*S.A.*, --- F.3d ----, 2005 WL 3485871, at * 8 (2d Cir. Dec. 21, 2005); *Feliciano v. United*

*States*, 2004 WL 1781005, at *4 (S.D.N.Y. Aug. 10, 2004); *Woo v. City of New York*,

1997 WL 277368, at *4 (S.D.N.Y. May 27, 1997). Even assuming that Ashraf did not

speak about the payment of taxes to any of his lawyers except Wander, the Defendants

would still be bound by the commitments made in open court by Blumenthal on their

behalf.[15] As the Court said in *Woo*, "A court in conducting its business must be able to

rely consistently on the premise that an attorney's representation to the court is made on

behalf of his or her clients." 1997 WL 277368, at *4.

 The Defendants point out that both parties failed to carry their commitment and

the Court's direction to reduce the March 18th Stipulation and Order to written form. But

they are wrong when they imply that the Court cannot find that the order violated was

"clear and unambiguous." A party may be held in civil contempt for violating an oral

Court order. See *United States v. Local 30, United Slate, Tile and Composition Roofers*,

1990 WL 6105, at *3 (E.D. Pa. Jan. 25, 1990); *In re Carrico*, 206 B.R. 447, 454 (S.D.

Ohio 1997). The rule is the same under New York law. *Betancourt v. Boughton*, 204

A.D.2d 804, 808, 611 N.Y.S.2d 941 (3d Dept. 1994); *Rudnick v. Jacobson*, 284 A.D.

---

[15] No contention has been made that Blumenthal was not authorized to make the representations he did.

1064, 1064, 136 N.Y.S.2d 127 (2d Dept. 1954); *Silverman v. Seneca Realty Co.*, 154

Misc. 35, 41, 276 N.Y.S. 466 (Sup. Ct. N.Y. Co. 1934).[16]  Moreover, it is not necessary

for the Trustee to prove that Ashraf intentionally violated the Court Order.  *McComb v.*

*Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Donovan v. Sovereign Sec.,Ltd.*, 726

F.2d 55, 59 (2d Cir. 1984); *N.L.R.B. v. J.P. Stevens & Co., Inc.*, 563 F.2d 8, 16-17 (2d

Cir. 1977); *Panix Promotions, Ltd. v. Lewis*, 2004 WL 421937, at * 2 (S.D.N.Y. 2004);

*In re Damon*, 40 B.R. 367, 374 (Bankr. S.D.N.Y. 1984).

The cases the Defendants cite in their Opposition to the motion for contempt are

distinguishable.  In *United States v. Charmer Industries, Inc.*, 722 F.2d 1073, 1079 (2d

Cir. 1983), the Second Circuit affirmed a ruling by the District Court that refused to find

a party in contempt on the ground that a formal order had not been issued.  In that case,

however, the Court's words had never taken the form of an order.  By contrast, in this

case, the Court so ordered the record, thereby making it clear that there was no mere

discussion between counsel or "colloquy," as the Defendants argue.  (Def.'s Opp'n to

Mot. for Contempt at 7.)  The holding in *Independent Living Aids, Inc. v. Maxi-Aids, Inc.*

is likewise inapposite.  The Court there ruled that the colloquy between counsel and the

Court did not clearly and unambiguously order the defendants to notify third party search

engines to remove the phrase "Independent Living Aids."  Instead, the Court instructed

the defendants to include the notification request in a subsequent written order.

*Independent Living Aids, Inc.*, 349 F.Supp.2d at 516.  In this case, by contrast, the

parties' failure to reduce the oral order to writing did not eviscerate the force of the

Court's oral order, and unlike *Independent Living Aids*, the Court did not direct the

---

[16] The rule may be different on an application for criminal contempt.  Although the Trustee's initial papers
cited criminal contempt cases, he has pursued only civil contempt remedies, and criminal contempt is not
an issue.

parties to add the issue of payment of taxes to the written order.  Finally, the Defendants'

reliance on *South Beach Suncare, Inc. v. Sea & Ski Corp.*, 1999 WL 350458, at *8 (S.D.

Fla. 1999), is unwarranted.  In that case, the defendant skirted the literal language of an

oral order by packaging its line of suncare products with two carrots as opposed to the

barred three carrots.  In no way can the transfer of a check to Bhatti personally, in the

circumstances set forth above, be deemed technical compliance with the Stipulation and

Court Order.

Since the Trustee has proven by clear and convincing evidence the underlying

violation and has not placed the burden on the Defendants to show that Ashraf's actions

did not violate the Court Order, we can turn, at this point, to the merits of the Defendants'

proffered explanation for the noncompliance.

The record is that Ashraf did not attempt to comply in good faith with the

representations that his duly authorized counsel had placed on the record, not even raising

with counsel his plans to take almost half of the principal out of the Restrained Funds.

The evidence with respect to the payment of Bhatti's "taxes" also fails to demonstrate an

attempt to comply with the Court Order but represents instead action to place the funds

beyond the jurisdiction of the Court.

EIF as a limited partnership paid no substantial taxes on its own but passed

through any liability for taxes on gains to its partners.  In its initial tax return for 2003,

EIF showed little income, and it may be presumed there was little or no tax liability to be

passed through to its limited partner, Ash Master Fund II, LP, which was shown as

having a 100% share of the capital and of the profit and loss sharing.  (Pls. Ex. 209.)

Subsequent to his February 16, 2005 deposition, Ashraf may have realized that the

transaction involving the Debtor and B of A would be subject to close scrutiny and that

EIF had not reported any gain from the enormous amounts EIF claimed as income from

interest and prepayment penalties in respect of the Pledge Agreement.  EIF filed an

amended 2003 tax return on April 29, 2005, disclosing additional income for 2003 of

approximately $12 million, $10.4 million of which was for prepayment penalties.  (Pls.

Ex. 210.)  But the tax return did not merely increase the income that EIF reported.  It also

changed the ownership of EIF.  The amended 2003 tax return for EIF no longer showed

Ash Master Fund II, LP as the sole limited partner with 100% ownership of capital and

100% of profit and loss sharing.  This return added Bhatti as a limited partner (although

the participation percentages of Ash Master Fund II, LP and Bhatti were not indicated).[17]

Ashraf could not explain why the original EIF return for 2003 did not list Bhatti as a

partner, although he testified at least twice that Bhatti became a partner in 2003.  (Tr.

Hr'g Aug. 11, 2005 at 44, Aug. 29, 2005 at 22-23.) [18]

      Who is Bhatti?  We know from Amanat's testimony that Bhatti is his second

cousin and at one point in time was a trader for Chimera Capital, a client of the Debtor.

(Tr. Hr'g July 15, 2005 at 51-52.)[19]  How did Bhatti become entitled to the millions of

---

[17] The 2004 tax return shows Bhatti as having an 80% share of the profit and loss in EIF, as well as an 80% share in ownership of capital.

[18] The record does contain a 2003 K-1 for Bhatti designating him as a limited partner of Ash Master Fund II, LP.  (Pls. Ex. 212.)  The K-1 shows Bhatti as having "various" percentages in profit and loss sharing in Ash Master Fund II, LP as well as 81.2931722% in ownership of capital.  The record also contains a 2004 K-1 for Bhatti, designating him as a limited partner of Ash Master Fund II, LP.  That K-1 shows Bhatti as having "various" percentages of profit and loss sharing in Ash Master Fund II, LP, as well as a beginning percentage of 94.3679082 and an ending percentage of 60.8585176 in ownership of capital.  Ashraf testified both that Bhatti was a limited partner in Ash Master Fund II and that Bhatti had never been a limited partner in Ash Master Fund II.  (Compare Tr. Hr'g Aug. 11 at 52-53 and Aug. 29 at 95-96.)

[19] Bhatti has also shown up as the alleged sole individual member of WR BSG, Ltd., an entity formed in the British Virgin Islands, that was allegedly the mediate recipient of a fraudulent conveyance from Epoch Investments, L.P., f/k/a Empyrean Investments, L.P., ("Epoch"), a limited partnership whose 99% limited partner is a trust with members of Amanat's family as beneficiaries.  Epoch is another debtor in Chapter 11 proceedings before this Court and has filed an adversary proceeding against WR BSG, Ltd. and other

dollars of the proceeds of the transactions between the Debtor, EIF and B of A?  Ashraf's

testimony was astonishingly vague.  Ashraf testified only that Bhatti had desired to work

for Ashraf's funds and offered to raise capital for them.  (Tr. Hr'g Aug. 24, 2005 at 94.)

What capital did Bhatti raise?  Ashraf did not identify any specific capital or any specific

clients that Bhatti had located by the time of the STARS and Collar transactions, and it

appears that the Defendant funds had no clients at that time other than the Debtor.

Ashraf's testimony was just as vague with respect to Bhatti's subsequent efforts:

> "at the time that he became a limited partner, there was very little to zero income
> in 2003.  And he helped identify and raise money for me, which is very
> significant when one is starting a business.  Furthermore -- and not having to pay
> them -- pay him in cash was sort of a way of giving him consideration for his role
> in helping to raise money for my entity."

(Tr. Hr'g Aug. 24, 2005 at 95.)

Even assuming that Bhatti became entitled to most of the EIF gain, for services

that have never been clearly identified, the evidence is just as vague and uncorroborated

by documentary support that the $6.7 million Ashraf sent to Bhatti actually paid a tax

liability that Bhatti had incurred.  Ashraf testified that after he had concluded that an

amendment had to be made to the tax returns, he also determined that Bhatti would be

subject to a substantial liability for taxes because Bhatti would have gain flowing through

to him from Ash Master Fund II, LP but no distribution of income.  Intending to warn

and inform Bhatti of this tax liability, Ashraf claims that he flew to Toronto in early

March 2005 to meet with Bhatti.[20]  He says Bhatti conditioned any meeting upon Ashraf

making an immediate payment of $7 million and refused to meet with him.  Ashraf

decided to wait a few days, and he allegedly did not meet or speak with Bhatti during this

---

defendants (05-2243) seeking, *inter alia*, recovery of the alleged fraudulent transfer.  WR BSG, Ltd.
defaulted in answering the complaint and Bhatti has never appeared.

[20] The only documentary evidence in the record of such a trip is a receipt for a plane ticket to Toronto.

time.  Subsequently, the Trustee filed the TRO, and on the date of the filing, Ashraf says

he had two telephone conversations with Bhatti, resulting in an agreement to pay Bhatti's

tax liability.  However, Bhatti would not, according to Ashraf, tell him the amount of the

liability, so Ashraf says he hired two Canadian accountants to calculate Bhatti's tax

liability because he knew the Canadian tax deadline was April 30, and that late tax

payments would incur significant penalties and interest for Bhatti.  Ashraf further

testified, with no documentary evidence in support, that the Canadian accountants arrived

at two different figures representing Bhatti's tax liability.  After taking the lower figure of

$6.7 million, Ashraf said that he issued a check to Bhatti personally in the amount of $6.7

million from the Restrained Funds. [21]

The only documented evidence from the above is that Ashraf sent a $6.7 million

check out of the country to Bhatti, Amanat's cousin.  Even if Ashraf had made a

distribution to Bhatti based on what Ashraf asserts was Bhatti's tax liability, this was not

"paying taxes."  The Court cannot credit the proposition that a businessman would

calculate the possible tax liability of a third party and pay him $6.7 million without

receiving a calculation of the actual liability or a commitment to use the funds for that

purpose.  Ashraf was under no legal or contractual obligation to pay Bhatti's taxes. [22]  At

---

[21] The Court notes that there is no documentary evidence in the record relating to these Canadian accountants, including the name of the accountants, the documents upon which the accountants relied to estimate the Canadian tax liability, and the paperwork the accountants generated in reaching a figure for the alleged tax liability.  The Defendants introduced into evidence a single document purporting to be from Bhatti, an e-mail to Ashraf dated April 28, 2005.  (Defs. Ex. W.)  The message refers to "the amended K-1" (the amended tax return for EIF adding Bhatti as a limited partner of EIF was signed by EIF's accountant the next day, April 29) and states that discussions with his tax advisors "have led me to believe that I *may* have incurred significant tax liabilities as a result of my Limited Partnership ownership in" EIF.  (emphasis added).  This document was admitted, over the Trustee's objection, solely as evidence of Ashraf's state of mind and not to prove that Ashraf had a tax liability or that he was a limited partner of EIF on the date it bears.  (Tr. Hr'g Aug. 24, 2005 at 68.)

[22] The Defendants argue that Bhatti had the right to withdraw funds from his capital account at EIF, citing § 3.02(a) of the Amended and Restated Partnership Agreement, Ex. 247.  (See Defs. Post-Tr. Br. in Opp'n. to Mot. for Contempt at 13.)  Bhatti's right to require a distribution does not constitute the "payment of

trial, Ashraf contended that there is a moral obligation based on hedge fund industry practice to assist a partner with taxes where the partner has imputed income and a possible tax liability based on income never received, but his testimony as to such a practice was vague and does not prove that Bhatti actually had a tax liability. The actions Ashraf undertook with regard to Bhatti do not constitute evidence of payment of a tax liability, much less an effort to comply in good faith with the Stipulation. [23]

Having found the Defendants in civil contempt, the Court may fashion an appropriate remedy. A court may award sanctions in civil contempt proceedings "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *A.V. by Versace, Inc.*, 87 F.Supp.2d at 289, citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). There are constitutional considerations that limit a court's ability to award seemingly punitive sanctions. *Id.* at 289. An award must reasonably relate to the facts of the case and not be arbitrary. *Id.* at 289, citing *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982). The Second Circuit has directed courts to weigh the following factors in fashioning a remedy: 1) the character and magnitude of the harm threatened by the continued contumacy; 2) the probable effectiveness of any suggested sanction in bringing about compliance; and 3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him. *Dole*

---

taxes." Moreover, under the Partnership Agreement, the right could be exercised subject to notice requirements as of the last business day of each fiscal quarter. There is no evidence that Bhatti exercised this right, and it certainly was not exercised at the end of a fiscal quarter.

[23] The lack of reality to the proposition that the Defendants paid Bhatti $6.7 million for taxes is particularly heightened when viewed from the perspective of the underlying lawsuit. These taxes allegedly arose from the very transaction the Trustee is attempting to set aside in a lawsuit that, if successful, would eliminate the income on which the tax liability is premised.

*Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987); *A.V. by Versace, Inc.*, 87 F.Supp.2d at 296.

Taking into account the *Dole* factors, the remedy in this case is easily fashioned. The Defendants must answer for the losses sustained by the Trustee from their actions and restore $6.7 million to the Restrained Funds.

## B.  The Defendants Also Breached An Agreed Stipulation Made In Open Court

The Plaintiffs have pursued a contempt remedy on this motion but have also, in their papers, alluded to the Defendants' breach of a stipulation entered into in open court. The Defendants' breach of a stipulation provides a further basis for entry of an order requiring restoration of $6.7 million to the Restrained Funds.

A stipulation of settlement on the record in court remains "one of the strongest and most binding agreements in the field of the law." *In re Cuffee*, 232 B.R. 53, 56 (E.D.N.Y. 1999); see also *Melwani v. Jain*, 2004 WL 936814, at *6 (S.D.N.Y. Apr. 29, 2004); *Foster v. City of New York*, 2000 WL 145927, at *3 (S.D.N.Y. Feb. 7, 2000).  An agreement "made on the record, in open court, and 'under the eyes of the Court,' is a most solemn undertaking requiring the lawyers and the parties to make every reasonable effort to carry out all the terms to a successful conclusion." *Manning v. New York Univ.*, 2001 WL 963982, at *18 (S.D.N.Y. Aug. 22, 2001), quoting *Warner v. Rossignol*, 513 F.2d 678, 682 (1st Cir. 1975); *Cuffee*, 232 B.R. at 56.  Courts favor stipulations because "strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation process." *Cuffee*, 232 B.R. at 56, quoting *Hallock v. State of New York*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984); see also *Bernstein Mgmt. Corp. v. Petker &*

*Buran Fur Corp.*, 201 B.R. 861, 863 (S.D.N.Y. 1996). Accordingly, parties are bound to

the terms of their agreement made on the record. *Winston v. Mediation Entm't Corp.*,

777 F.2d 78, 80 (2d Cir. 1986); *Cuffee*, 232 B.R. at 56. This means that parties are bound

to agreements entered into on the record in open court by an attorney who has actual or

apparent authority to so act. See *Pereira v. Sonia Holdings, Ltd. (In re Artha Mgmt.,*

*Inc.)*, 91 F.3d 326, 329 (2d Cir. 1996); *United States v. Int'l Bd. of Teamsters, Chauffers,*

*Warehousemen and Helpers of America*, 986 F.2d 15, 19 (2d Cir. 1993).

Open court stipulations are treated as contracts to be construed in accordance with

contract law principles. *Omega Eng'g, Inc.*, ---F.3d at ----, 2005 WL 3485871, at *5

(under New York law, a "settlement agreement is a contract that is interpreted according

to general principles of contract law"); *Rella v. N. Atl. Marine, Ltd.*, 2004 WL 1418021,

at *3 (S.D.N.Y. June 23, 2004); *Bernstein Mgmt. Corp.*, 201 B.R. at 863. As with any

other agreement, there must be "a meeting of the minds between the parties on all

essential terms." *Rella*, 2004 WL 1418021, at *3. The existence of an enforceable

settlement is a question of fact that the court must resolve by analyzing the "totality of the

circumstances." *United States v. Sforza*, 326 F.3d 107, 116 (2d Cir. 2003). However,

unlike a motion for contempt, an action for a breach of a settlement agreement requires

only proof by a preponderance of the evidence of four elements: 1) the existence of a

contract; 2) performance of the contract by one party; 3) breach by the other party; and 4)

damages. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).

In this case, the existence of an agreement made on the record between the parties

is not in dispute. Both parties in their papers refer to the "agreement," the "stipulation on

the record" or the "agreed-upon TRO." (See e.g., Tr. Hr'g March 18, 2005 at 4

(corrected version); Tr. Hr'g March 18, 2005 at 9 (corrected version); Tr. Hr'g April 1,

2005 at 40; Tr. Hr'g Aug. 30, 2005 at 19.)  The Stipulation contained a promise on the

part of the Trustee not to pursue the TRO in exchange for a return promise by the

Defendants not to withdraw monies from the Restrained Funds without the agreement of

the Trustee or a Court order.  There is also no dispute that Wander had actual or apparent

authority to make this return promise to the Trustee and bind the Defendants to the

Stipulation made in open court.  The Trustee did in fact present the agreed TRO to the

Court on March 18.  Thus, the first two elements of an action for breach of the agreement

are easily proved.

        The Defendants argue, however, that the terms of the Stipulation and their breach

of those terms is not so easily proved, and that the Trustee has not proved that the

Stipulation was unambiguous.  Under New York law, the initial construction of an

agreement "'is a matter of law for the courts to decide.'"  *Cooper v. Gottlieb*, 2000 WL

1277593, at *5 (S.D.N.Y. Sept. 8, 2000), quoting *K. Bell & Assoxs., Inc. v. Lloyd's

Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996); see also *Readco, Inc. v. Marine Midland

Bank*, 81 F.3d 295, 299 (2d Cir. 1996).  The initial construction includes the threshold

question "whether the terms of the contract are ambiguous."  *Alexander & Alexander

Servs. v. Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).  A

contract is unambiguous if it possesses a "definite and precise meaning, unattended by

danger of misconception in the purport of the [contract] itself," and no reasonable basis

for a difference of opinion exists.  *Sayers v. Rochester Tel. Corp. Supplemental Mgmt.

Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).  If a contract is unambiguous on its face, a court

must give effect to the contract as written and may not consider extrinsic evidence to

evince the parties' intentions. *Bernstein Mgmt. Corp.*, 201 B.R. at 863, citing *Huertas v. E. River Hous. Corp.*, 992 F.2d 1263, 1266 (2d Cir. 1993). Plain contractual language is not ambiguous simply because the parties offer different interpretations. *Metropolitan Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

While courts may not consider extrinsic evidence to evince parties' intentions with regard to an unambiguous contract, in interpreting agreements, courts afford great weight to a party's practical interpretation of its own agreement. *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994); *Bradlees Stores, Inc. v. St. Paul Fire and Marine Ins. Co. (In re Bradlees Stores, Inc.)*, 291 B.R. 307, 312 n.3 (Bankr. S.D.N.Y. 2003). Further, the "parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transp. Line, Inc. v. American Philippine Fiber Indus.*, 743 F.2d 85, 91 (2d Cir. 1984); see also *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."). As discussed above, Blumenthal, then counsel for the Defendants, confirmed the lack of ambiguity in the Stipulation during the April Hearing and prior to the current litigation. Recognizing that the parties could not agree on a carve-out for the payment of taxes, Blumenthal represented that Ashraf had *backed off* and *agreed* to keep the Court Order in place with respect to the Restrained Funds. The practical interpretation of the Stipulation by the parties confirms that the Defendants could not withdraw monies from the Restrained Funds without the Trustee's permission

or, in its absence, Court approval.  Ashraf's payment of $6.7 million to Bhatti constituted

a breach of the agreed Stipulation made in open court.

The final requirement in any contract action is that the plaintiff suffer damages.

Every breach of contract entitles the party injured to sue for damages so as to place the

aggrieved party in the same economic position it would have had if both parties had fully

performed.  *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720 (2d Cir. 1992).  In this case, to

put the Trustee in the same economic position as if the Stipulation had been performed,

the Defendants must restore $6.7 million to the Restrained Funds.

## II.  The Trustee's Motion to Consolidate

The Trustee has moved to consolidate the preliminary injunction hearing with the

final trial of the instant action.  Fed. R. Civ. P. 65(a)(2) governs the Trustee's motion,

giving courts discretion to consolidate preliminary injunction hearings with the trial of an

action on the merits.[24]  The last sentence of Rule 65(a)(2), however, tempers this grant of

authority by directing that "[t]his subdivision (a)(2) shall be so construed and applied as

to save to the parties any rights they may have to trial by jury."  The Seventh

Amendment, in turn, guarantees a right to a trial by jury in "Suits at common law where

the value in controversy shall exceed twenty dollars."  The Supreme Court has defined

suits at common law to mean those "suits in which *legal* rights were to be ascertained and

determined, in contradistinction to those where equitable rights alone were recognized,

and equitable remedies were administered."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S.

---

[24] The first two sentences of Rule 65(a)(2) provide as follows: "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.  Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial."

33, 41 (1989). In *Granfinanciera*, the Supreme Court held that parties who have not filed

claims against the bankruptcy estate have a right to a jury trial in an action by the trustee

to recover a fraudulent transfer. *Id*. at 43, 58-59; see also *Langenkamp v. C.A. Culp*, 498

U.S. 42 (1990) (same for preference suits). Actions for breach of contract, of course,

import a right to trial by jury. See *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962).

In this case, the Trustee is pursuing claims based on alleged fraudulent transfer,

preferential transfer and breach of contract. The Defendants have not filed proofs of

claim against the bankruptcy estate. It therefore appears that consolidation of the

preliminary injunction hearing with the final hearing is not consistent with the

Defendants' rights to a jury trial.

The Trustee attempts to reconcile his motion with the Defendants' rights to a jury

trial by raising three arguments. First, the Trustee argues that EIF and EGP waived their

right to a jury trial in Paragraphs 13 and 14 of the Note executed on March 28, 2003 in

connection with the Pledge Agreement. Paragraph 14 provides as follows:

> **EACH OF BORROWER AND, BY ITS ACCEPTANCE HEREOF,
> LENDER HEREBY WAIVES TO THE FULLEST EXTENT
> PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT
> MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY
> PROCEEDING.**

(Pls. Ex. 85 at 7) (emphasis in the original). Paragraph 13 in turn describes "Proceeding"

as "any suit, action or proceedings relating to this Note or any other Loan Document."

(Pls. Ex. 85 at 6-7.) Paragraph 6(b) of the Note further defines Loan Document as "this

Note and the Pledge Agreement . . . and any other documentation that Borrower is

required by this Note or the Pledge Agreement to execute." (Pls. Ex. 85 at 3.) The

Trustee argues that this waiver should extend to all of the claims in the Complaint and all of the Defendants in this action.

There is no question that EIF, as the borrower under the Loan Documents, waived its right to a jury trial for any Proceeding relating to any Loan Document. There has been no contention that the waiver was not entered into knowingly, intentionally, and voluntarily, or that EIF did not understand what it was doing. The waiver is set forth in the Note in capital letters and boldface, and no argument has been raised that it was not sufficiently conspicuous or that there was a gross disparity of bargaining power between the parties. Jury waivers are enforceable when properly drafted without coercion or undue influence, and this waiver may accordingly be enforced with respect to any contract claims relating to the Loan Documents, including the Pledge Agreement and Note. *Morgan Guar. Trust Co. of New York v. Crane*, 36 F.Supp.2d 602 (S.D.N.Y. 1999); *Wechsler v. Hunt Health Systems, Ltd.*, 2003 WL 21878815, at *6 (S.D.N.Y. Aug. 8, 2003), *mot. for recons. denied*, 285 F.Supp.2d 343 (S.D.N.Y. 2003).

The Trustee's breach of contract claims against EIF are set forth in Count XII of the Complaint. The remaining counts assert claims that primarily seek avoidance of alleged constructive and intentional fraudulent conveyances, although there are also counts charging preferential transfers.[25] As discussed above, EIF presumptively has a right to a trial by jury of the avoidance claims, and the question accordingly is whether the jury waiver in this case can be extended from contract claims based directly on the Pledge Agreement and Note to claims that EIF's entry into the Pledge Agreement and

---

[25] There are also counts that seek a preliminary injunction or declaratory relief with regard to the other counts, as well as claims for equitable subordination and disallowance of any claim that EIF might file. These latter claims appear superfluous because the Defendants did not file proofs of claim.

Note, and/or payments made to EIF under the Pledge Agreement and Note, were intentional or constructive fraudulent conveyances or preferences.

The jury waiver in the Pledge Agreement is a very broad one, extending to "any suit, action or proceedings relating to this Note or any other Loan Document," which includes the Pledge Agreement.  Courts have construed broad jury waiver provisions to extend to non-contract claims that "relate to" the relationship between the parties.  For example, in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l. Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993), a jury waiver of controversies "arising out" of a contract was held to reach "all disputes…whether or not they implicate interpretation or performance of the contract per se."  In *Brown v. Cushman & Wakefield, Inc.*, 235 F.Supp.2d 291 (S.D.N.Y. 2002), the Court held that a jury waiver clause in an employment agreement applied to discrimination as well as contract claims.  In both of these cases, the waiver encompassed matters "arising out" of the subject agreement.  The jury waiver in the instant matter waives a jury in any suit "relating to" the contract, and it has been held that the words "relating to" are broader than "arising out of."  *Smith v. Lucent Technologies*, 2004 WL 515769, at *8 (E.D. La. March 16, 2004).

There is substantial force to the contention that the constructive fraudulent conveyance claims in the complaint against EIF relate directly to the Pledge Agreement and Note.  It is through the Pledge Agreement and Note that EIF claims the right to most of the proceeds of the STARS and Collar transactions, and through these agreements that the Debtor allegedly transferred value without adequate consideration.  If EIF were the

only defendant and the only claims were for constructive fraudulent conveyance, the

Trustee's argument that there has been a jury waiver might well be valid. [26]

But EIF is not the only defendant named in the Complaint and claims are also

asserted that the Defendants are liable on grounds of intentional fraudulent conveyance

and for preferential transfers. These claims also impart a right to trial by jury and are less

closely "related to" the Pledge Agreement than the constructive fraudulent transfer

claims. Moreover, there are multiple defendants who did not waive a jury with respect to

any claims. These Defendants include EGP, which was the collateral agent under the

Loan Documents but was not the borrower or lender, as defined therein, and therefore

was not expressly included in the waiver provision, and other Defendant hedge funds

controlled by Ashraf that were not parties to the Loan Documents at all. The Trustee

argues that EIF's jury waiver can be extended to these entities through theories of veil

piercing, alter-ego and estoppel, arguing that courts have imposed contractual arbitration

clauses on a party's "alter-ego" by means of veil-piercing or estoppel theories, and that

this Court should extend the EIF jury waiver on the same premise to the other

Defendants.[27]   There is, however, no authority for the proposition that an arbitration

clause can be analogized to a jury waiver. The right to trial by jury is preserved by virtue

of the Constitution, and jury trial waivers are narrowly construed and enforced only if

---

[26] The only case cited by the parties that discusses a jury waiver clause in the context of a fraudulent
conveyance action is *Wechsler*, noted above. There the parties conceded that the jury waiver in a contract
did not extend to a trustee's fraudulent conveyance claims, 2003 WL 21878815 at *2, and the Court did not
have occasion to analyze the issue. However, the waiver there was much narrower than the waiver in the
instant case, extending only to "any action brought under this Agreement." *Id.* at *6.

[27] There is authority that a court may bind non-signatories to arbitration agreements when complete
"abandonment of separateness" between the non-signatory and signatory exists. See *Thomson-CSF, S.A. v.
Am. Arbitration Assoc.*, 64 F.3d 773, 778 (2d Cir. 1995); *Carte Blanche (Singapore) Pte., Ltd. v. Diners
Club Int'l, Inc.*, 2 F.3d 24, 29 (2d Cir. 1993) (abandonment of separateness existed where the subsidiary did
not possess any bank accounts, offices, stationery, transactions or any other activities). A court may also
pierce the corporate veil in appropriate circumstances. *Wm. Passalacqua Builders, Inc. v. Resnick
Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

entered into knowingly, intentionally and voluntarily.  See *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977).  The Defendants other than EIF did not waive their right to a jury trial and, while parties to the litigation, are entitled to a jury trial under the Seventh Amendment and *Granfinanciera*.

The Trustee suggests alternatively that the Court should consolidate the preliminary injunction hearing with a final hearing on all equitable claims and reserve the jury issues for a later trial.  The Supreme Court held in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959), that the right to a jury trial of legal issues can be lost through prior determination of equitable claims "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate."  359 U.S. at 510-11.  In *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), the Court further held that 1) a district judge had erred in refusing to grant a jury trial for the factual issues relating to breach of contract and 2) since the factual issues on the legal claims were common to the issues underlying the equitable claims, "the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims."  369 U.S. at 479.  The Supreme Court later limited the holding of *Beacon Theatres* to "no more than a general prudential rule," *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 334 (1979), and since then, some courts in rare circumstances have adjudicated equitable claims prior to a jury's determination of the legal claims.  See *W. Geophysical Co. of Am., Inc. v. Bolt Assocs., Inc.*, 440 F.2d 765 (2d Cir. 1971); *Wechsler*, 285 F.Supp.2d at 349 (S.D.N.Y. 2003).

But *Wechsler* and *Western Geophysical* are not on point.  *Wechsler* held that the Court could decide breach of contract claims (as to which the relevant defendants had

waived their jury rights) before deciding the fraudulent conveyance claims (as to which defendants did have a jury right) because the legal and equitable claims did not share an underlying factual basis. *Wechsler*, 285 F.Supp.2d at 348. Here, as discussed above, the Trustee argues that the jury waiver can be extended from the contract claims to the fraudulent conveyance claims *because* the claims share exactly the same genesis. Similarly, the legal counterclaim in *Western Geophysical*, for which the defendants demanded a jury trial, was added three and a half years after the suit was initially brought, one month after a pre-trial conference and after the parties had conducted extensive discovery. *W. Geophysical Co.*, 440 F.2d at 771-72. There is no basis in this case for not following the principles of *Beacon Theatres* and *Dairy Queen* and providing for trial by jury of the legal claims before the equitable claims are determined.

In conclusion, at the present stage of the case, EIF's rights with respect to some of the claims against it, and the right of the Defendants other than EIF to a trial by jury cannot be reconciled with the Trustee's motion to consolidate the preliminary injunction hearing with the final hearing in this case. Accordingly, the Trustee's motion to consolidate the preliminary hearing with the final hearing is denied at this time. Since that motion is denied, and since no motion directly relating to EIF's jury demand is before the Court, there is no need for a final determination as to whether EIF's jury waiver can be construed to extend beyond contract claims. Moreover, it is obvious that nothing stated herein would affect the right of any party to make an appropriate motion for summary judgment. The Trustee adverts to such a motion as a further reason to deny a jury trial, but there is no such connection, and summary judgment does not abridge the

right to trial by jury.  See 10A Wright, Miller & Kane, *Federal Practice and Procedure* §

2714, at 247-52 (1998).

### III.  The Trustee's Motion to Amend the Complaint to Add Certain Defendants

The Trustee has further moved to add three new defendants as parties: AMNF

because it holds proceeds from the Non-Escrow E*Trade Stock; and AF (formerly known

as Empyrean Investment Fund, LP) and EFLP, to the extent the latter are separate entities

from Ash Fund LP (formerly known as Empyrean Fund, LP) because both funds may

have held Non-Escrow E*Trade Stock proceeds.  The Defendants respond that the

Trustee waited too long to file the motion to add AMNF and has not demonstrated any

legally cognizable basis for adding AF and EFLP.

Rule 21 governs amendments seeking to add parties and permits joinder "at any

stage of the action and on such terms as are just."  Fed. R. Civ. P. 21; *Banco Cent. Del*

*Paraguay v. Paraguay Humanitarian Found., Inc.*, 2003 WL 21543543, at *2 (S.D.N.Y.

July 8, 2003).  Courts have held that Rule 21 should be construed with the "same

standard of liberality afforded to motions to amend pleadings under Rule 15."  *Rissman v.*

*City of New York*, 2001 WL 1398655, at * 1 (Nov. 9, 2001).  Under Rule 15(a), leave to

amend a pleading "shall be freely given when justice so requires."[28]

The Second Circuit has held that a "motion to amend should be denied only for

such reasons as undue delay, bad faith, futility of the amendment, and perhaps most

important, the resulting prejudice to the opposing party."  *Richardson Greenshields Sec.,*

*Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987).  Courts have interpreted those

---

[28] The Trustee originally requested that the Court amend the complaint pursuant to Fed. R. Civ. P. 15(a).
While Rule 15(a) does govern amendments to complaints, the real relief the Trustee seeks is the joinder of
three additional defendants.  Rule 21, regulating the joinder of parties, controls such relief.  See *SEB S.A. v.*
*Montgomery Ward & Co., Inc.*, 2002 WL 31175244, at *4 (S.D.N.Y. Oct. 1, 2002).

exceptions narrowly.   Bad faith cannot be established by conclusory assertions that the

proposed amendments are part of a strategy to delay a case. *Banco Cent. Del Paraguay*,

2003 WL 21543543, at *4.  An amendment is not futile when the proponent has "at least

colorable grounds for relief." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities

Inc.*, 748 F.2d 774, 783 (2d Cir. 1984)).   The addition of a new party or claim results in

undue prejudice only when the addition 1) requires the expenditure of significant

additional resources to conduct discovery and prepare for trial; 2) significantly delays the

resolution of the dispute; or 3) prevents the plaintiff from bringing a timely action in

another jurisdiction. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Finally, a court should not deny the right to amend on grounds of mere delay *absent* a

showing of bad faith or undue prejudice. *Richardson Greenshields Sec., Inc.*, 825 F.2d at

653 n.6, citing *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

In this case, justice requires allowing the Trustee to amend the complaint to join

AMNF, AF and EFLP as defendants.  The Trustee brought suit against multiple hedge

funds owned by Ashraf but may have overlooked three relevant funds.  The case has

proceeded, however, as if one of the three funds was an existing defendant, evidenced by

Ashraf's agreement to include monies in an account at AMNF as part of the Restrained

Funds.  In any event, all of the existing Defendants have taken the same litigating

position and are represented by the same counsel.  There is no evidence of any undue

delay or bad faith on the part of the Trustee and prejudice to the opposing party.  The

joinder of these new defendants would not require any additional discovery.  The

proceedings would not be unduly delayed, and the Defendants' unsubstantiated assertion

that the Trustee has a dilatory motive in requesting this amendment is not sufficient to

support a finding of bad faith. There also would be no futility in allowing the amendment because the Trustee has a colorable ground for relief. The three hedge funds hold or may have held proceeds of the Non-Escrow E*Trade Stock and are therefore proper defendants in the underlying adversary proceeding. 11 U.S.C. § 550. Further, even if the Trustee knew of the existence of AMNF as early as March 1, 2005, mere delay without undue prejudice or bad faith is not a sufficient basis to deny joinder. Thus, the Court will grant the Trustee's motion to amend the complaint to add AMNF, AF and EFLP as defendants.

## IV.  The Defendants' Motion to Clarify and Modify the July 22nd Order

While the other motions were *sub judice*, the Defendants moved on December 2, 2005, pursuant to Fed. R. Civ. P. 60(b)(5), 60(b)(6) and 65(b), for clarification and modification of the Court's prior order to allow Ashraf to "actively manage" the Restrained Funds and to withdraw a relatively modest amount of money from the Restrained Funds for attorney's fees and contractual management fees. In support of the motion, Ashraf asserts, among other things, that the Restrained Funds are the only hedge funds currently under his management and that he has suffered and will continue to suffer irreparable damage to his professional reputation and future earning ability from the fact that the Restrained Funds have been idle, negatively affecting the lifetime results of his group of funds. Ashraf further contends that his only means for paying the defense fees in this litigation are the Restrained Funds. His counsel stated at oral argument on December 13, 2005, that in 2003 and 2004, Ashraf had ten to twenty clients and $40 million in funds under his control, but as of August 2005, he had no clients and only $5 million currently escrowed in the Restrained Funds.

On the basis of the present record, the motion must be denied, without prejudice. At this stage, the Court cannot understand how the remaining portion of the Restrained Funds can be Ashraf's only source of income or available cash. It will be recalled that the Defendants claim that Bhatti had $6.7 million in tax liability but had never received a distribution in respect of the income from the STARS and Collar transactions earned by the hedge funds. What happened to these millions of dollars of income that were never distributed? Moreover, in light of the Court's finding that Ashraf is in contempt of a prior order, Ashraf has to explain how the Defendants are going to restore the $6.7 million paid over to Bhatti before he can contemplate any further depletion of the Restrained Funds or any trading of the remaining funds. On the other hand, as the Court emphasized at oral argument of this latest motion, nothing in any of the prior orders and nothing herein is designed to preclude Ashraf from engaging generally in the hedge fund business. Nothing prevents Ashraf from raising new money from new investors and placing it in any of the Defendant funds and receiving customary management fees and expenses in connection therewith.

As for the contention that Ashraf has no other source of income, the Court cannot assume, based on the present record, that Ashraf gave most of the proceeds of the STARS and Collar transactions to Bhatti and left himself a pauper. It is recognized that a restraint imposed by Court order should not ordinarily preclude a party from being able to finance a defense. See *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994); *Mason Tenders Dist. Council Pension Fund v. Messera*, 1997 WL 223077, at *9 (S.D.N.Y. May 1, 1997). Before an order allowing the Defendants to withdraw monies from the Restrained Funds can be entered, however, it

will be necessary to have a much clearer record as to what happened to the money and how the Defendants intend to cure the contempt. Cf. *Fed. Sav. & Loan Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987). The motion is denied without prejudice.

## Conclusion

For the reasons set forth above, the Court finds Ashraf in civil contempt and finds that Defendants are in breach of the agreed Stipulation made in open court. Plaintiffs are entitled to an order requiring the Defendants to restore $6.7 million to the Restrained Funds. The Court denies the Trustee's motion to consolidate the preliminary injunction hearing with the final hearing, without prejudice, and grants the Trustee's motion to amend the complaint. The Court denies the Defendants' motion to clarify and modify the prior order, without prejudice. The Trustee shall settle an appropriate order or orders on ten days' notice.

Dated: New York, New York
        January 10, 2006

                            */s/ Allan L. Gropper* _____
                            UNITED STATES BANKRUPTCY JUDGE