UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                          Chapter 11

MARKETXT HOLDINGS CORP.,                         Case No. 04-12078 (ALG)

                          Debtor.

-----------------------------------------------------------------x

ALAN NISSELSON, as Chapter 11 Trustee of
MarketXT Holdings Corp., and the Official
Committee of Unsecured Creditors,

                          Plaintiffs,


        - v. -


EMPYREAN INVESTMENT FUND, L.P.,
EMPYREAN GENERAL PARTNER, LLC,
ASH MASTER FUND, LP, ASH MASTER                  Adv. No. 05-01268 (ALG)
II, LLC, ASH MASTER FUND II, LP,
ASH FUND, LP f/k/a EMPYREAN
FUND LP, EMPYREAN FUND, LP,
ASH FUND, LP f/k/a EMPYREAN INVESTMENT
FUND, LP, ASH FUND II LP, ASH CAPITAL, LLC
f/k/a ASH CAPITAL MANAGEMENT, ASH
GENERAL PARTNER, LLC, ASH OFFSHORE
FUND LTD, ASH GENERAL PARTNER
OFFSHORE, LTD, ASH MARKET NEUTRAL
FUND, LTD and RAUF ASHRAF

                          Defendants.
-----------------------------------------------------------------x


## MEMORANDUM OF OPINION


A P P E A R A N C E S:

WINDELS MARX LANE & MITTENDORF, LLP
Attorneys for Alan Nisselson, Chapter 11 Trustee, Plaintiff
        By:  Howard L. Simon, Esq.
61 Broadway, 18th Floor
New York, New York 10006

1

KAYE SCHOLER LLP
Attorneys for the Official Committee of Unsecured Creditors, Plaintiff
        By:  Lester M. Kirshenbaum, Esq.
             Margarita Y. Ginzburg, Esq.
             Dina Rovner, Esq.
425 Park Avenue
New York, New York 10022

DENNER PELLEGRINO LLP
Attorneys for the Defendants
        By:  Robert Sinsheimer, Esq.
             Laura Malouf, Esq.
             Alexander L. Cataldo, Esq.
Four Longfellow Place
Boston, Massachusetts 02114


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

       This is an adversary proceeding brought by the Chapter 11 Trustee of the debtor,

MarketXT Holdings Corp. (the "Debtor"), and its unsecured creditors committee

(together, "Plaintiffs").   Defendants are Rauf Ashraf and several funds that he controls

(collectively, "Defendants"), including "Empyrean Investment Fund, LP ("EIF") and

Empyrean General Partner, LLC ("EGP").   The Amended Complaint seeks to recover on

behalf of the Debtor's estate certain transfers of property to Defendants.  Discovery

having concluded, Plaintiffs have moved for summary judgment on several of the counts

of the Amended Complaint and Defendants have responded; both parties have placed an

enormous record before the Court.  Based on that record, the Court adopts the following

findings of fact and conclusions of law.

FACTS

The Debtor is a corporation, once known as Tradescape Corp., Tradescape.com, Inc., and T Corp., which was owned and operated by Omar Amanat ("Amanat") and members of his family. The Debtor developed and at one time had great success with an electronic system for trading securities, but by the winter of 2001-2002 had deteriorated. On June 3, 2002, it sold its wholly-owned subsidiary, Momentum Securities, LLC, to E*Trade Financial Corp. ("E*Trade") for 11,750,000 shares of E*Trade stock (originally calculated to have a market value of $100 million) and a potential additional $180 million in E*Trade stock if Momentum thereafter achieved certain defined annual revenue thresholds (the "Earn Out").

Of the 11,750,000 shares, 2.4 million were placed in escrow to protect against possible claims against Momentum. The remaining 9,400,000 shares (the "Non-Escrow E*Trade Stock") were initially subject to contractual and securities law restrictions limiting the Debtor's ability to dispose of the stock without registration and/or E*Trade's cooperation. Although the shares were registered for SEC purposes on November 27, 2002, there is evidence in the record that the Debtor continued to have difficulty liquidating the shares at a time when it was under increasing pressure from creditors to raise cash. Some of the pressure came from the Debtor's largest and most vociferous creditor group, Softbank Finance Corp. and its affiliates (collectively, "Softbank"). Softbank had sued the Debtor to collect some of the claimed debt, and the parties had entered into a settlement agreement pursuant to which the Debtor acknowledged obligations to Softbank of approximately $33,000,000 and agreed to fund the settlement by borrowing against some portion of the Non-Escrow E*Trade Stock. The record

indicates that Softbank had set March 31, 2003, as an absolute deadline for the Debtor to

make a substantial payment on the debt or face an involuntary bankruptcy petition.

The record is disputed as to the Debtor's ability to sell the shares to raise cash, but

there is no dispute that it eventually negotiated two transactions with an affiliate of Bank

of America ("B of A").  These transactions are central to the issues in this lawsuit and

must be examined in detail.[1]

### (i) The STARS Transaction

Amanat enlisted the participation of defendant Ashraf in the first transaction.

Ashraf was just embarking as the founder and prospective manager of a group of hedge

funds in Boston, and Ashraf and the Debtor's principal, Amanat, had some business

interests in common.  The initial structure of the first B of A transaction had one of

Ashraf's funds, EIF, acting as middleman between the Debtor and B of A, obtaining a

pledge of the stock from the Debtor, obtaining value for the stock from B of A, and

advancing to the Debtor and some of its creditors the proceeds obtained from B of A.

Specifically, on March 28, 2003, the Debtor pledged to EIF the 9,400,000 shares

of Non-Escrow E*Trade Stock pursuant to a Pledge Agreement (the "Pledge

Agreement").  In return, EIF agreed to advance to the Debtor up to $17,200,000, which

was 50% of the then market value of the pledged shares (based on the lowest price of

E*Trade stock during the preceding 20 days), payable only from the proceeds of the re-

hypothecation of the stock itself.  Any distribution to the Debtor, however, was subject to

the terms of the Pledge Agreement, which provided for the payment of $11.6 million to

---

[1] During the same period the market price of E*Trade shares was falling dramatically.  Some of the facts
found herein were also established, in some cases with slightly different detail, in connection with
Plaintiffs' motion to hold Defendants in contempt for having diverted funds out of an escrow established
pursuant to Court order.  See *In re MarketXT Holdings Corp.*, 336 B.R. 39, 45-47 (Bankr. S.D.N.Y. 2006).

Softbank, certain additional payments to other creditors and use of 17/18[th] of any

additional proceeds to pay Softbank.[2]  Under the terms of the Pledge Agreement, EIF was

not permitted to sell the shares to a third party, such as B of A.  Section 6(e) of the Pledge

Agreement permitted EIF to re-pledge the stock but only on the condition that EIF could

repossess the stock on five business days' notice.  The stock remained the property of the

Debtor.

The note evidencing the EIF advances originally was for one year and bore

interest at the non-default rate of 8%.  Since EIF was advancing to the Debtor the

proceeds of the Debtor's own property, the Trustee contends that the 8% interest rate

gave EIF a handsome return for its services but still allowed the Debtor, to the extent

necessary, to repay the "loan," require EIF to recall the shares it had re-pledged, and

recover the pledged shares.

However, the transaction was not carried out in the original form.  At some point,

Amanat and Ashraf agreed to substitute a note (the "Note") bearing interest at 19% per

annum over a four-year term, with a "prepayment penalty" equal to 19% over the life of

the loan if the Debtor paid down any of the advances prior to maturity.  By the terms of

the prepayment penalty, EIF claims it became entitled to most of the remaining value of

the stock.[3]

---

[2] Once the $11.6 million designated for Softbank had been paid, the Debtor was contractually obligated to
pay 17/18[th] of the proceeds to satisfy the remaining Softbank debt and entitled to keep 1/18[th] of the
proceeds.
[3] The Trustee alleges that since EIF was responsible for funding a "loan" only with the proceeds from the
sale to B of A, the four-year 19% "prepayment penalty" purported to afford Defendants at least 76% of the
value of the proceeds of the Non-Escrow E*Trade Stock with no investment of their own, even if the
"loan" were repaid immediately.  The Trustee further alleges that although some of the Debtor's creditors
were informed that an Ashraf entity would be making a one-year 8% loan, no creditor was informed that
Amanat and Ashraf had changed the terms of the loan to a four-year loan at an interest rate of 19%, with a
further 19% prepayment penalty over the life of the loan.

Moreover, as will be seen below, EIF did not merely re-hypothecate the stock—it sold the stock to B of A.[4]  Specifically, ten days after the transaction described above, on April 9, 2003, EIF and B of A consummated a "STARS Variable Share Prepaid Forward Contract," in which EIF transferred 6,746,168 of the shares of the stock to B of A for $27,435,933.30 (the so-called "STARS transaction").[5]  B of A undertook to liquidate the shares, retaining for itself any appreciation in their value.  As had earlier been agreed, EIF paid $11.6 million of the B of A proceeds to Softbank and $200,000 was paid to a secured creditor named Scott Appleby.  An additional $162,000 was paid to reimburse Ashraf, who had a few days before satisfied a judgment lien on the Non-Escrow E*Trade Stock held by another creditor, Dan Connell, which was a condition to the STARS transaction.[6]  But 17/18[th] of the balance was not paid to Softbank as contemplated or to any of the Debtor's other creditors.  EIF kept the balance of $15.5 million, transferring it to various accounts held in Defendants' names.[7]

*(ii) The Collar Transaction*

About a month after the STARS transaction closed, in early May 2003, the Debtor entered into a second transaction directly with B of A (the so-called "Collar transaction").  This was a put/call transaction with B of A which resulted in the remaining 2,400,000

---

[4] By letter dated August 20, 2003, Amanat also purported to release EIF from its violation of § 6(e)(ii) of the Pledge Agreement that precluded EIF from selling, rather than re-pledging, the E*Trade Stock. (Defendants' Exh. R.)  As further discussed below, this was a time when Amanat and Ashraf took several steps to re-paper the original transaction.

[5] The 6.7 million shares had been registered in EIF's name on April 6, 2003.  See Plaintiffs' Statement of Uncontested Fact ("SOF") 40.

[6] This was the one monetary consideration that Defendants contributed to the transaction.  Another 101,332 shares of E*Trade Stock which remained in the Debtor's name was reregistered in the name of James Lee to pay off his $410,000 claim, which had also been secured by a lien on the stock.  SOF 46.

[7] The record does not contain a clear analysis by Defendants as to their claim of right to the $15.5 million. It appears that EIF kept the balance of the $15.5 million on the theory that any funds belonging to the Debtor and left in its control constituted a prepayment of the Note, triggering the prepayment penalty. Ashraf's declaration submitted in opposition to the Plaintiffs' summary judgment motion asserts that the prepayment penalty "has led to all of the income claimed by EIF . . ." (¶ 22)

shares of the Non-Escrow E*Trade Stock being liquidated for approximately

$14,600,000.  EIF was not a party.  Plaintiffs contend that the Debtor's creditors did not

have knowledge of this transaction when it took place, and Defendants have not pointed

to any evidence to the contrary.

Of the proceeds from the Collar transaction, B of A paid $200,000 to the Debtor

to cover certain expenses, B of A received approximately $400,000 for its services, and

approximately $760,000 was distributed to various individuals and entities (including

$400,000 paid to an account in the name of Tradescape.com, one of the Debtor's former

names).  The remaining balance of $13.2 million was first transferred to two accounts in

the name of T Corp. Technologies, an affiliate of the Debtor controlled by Amanat or his

brother, Irfan Amanat.[8]  The first account was at the brokerage firm of CCS/White

Pacific Securities and the second was at the firm of Sanford Bernstein.  It is not disputed

that Amanat and Ashraf made some attempts to use the funds in both of these accounts to

trade in securities through E*Trade, presumably to pursue the Earn Out.  It is also

undisputed that they were unsuccessful.[9]

In August 2003, the $13.2 million was moved to an account at Goldman Sachs

opened by one of the Defendants, Ash Master Fund.  The $13.2 million deposit was

originally booked as a capital contribution to the Ash Master Fund (one of the

Defendants) by a Cook Islands trust, Epic Investments Trust ("EIT").[10]  EIT, created by

---

[8] The Trustee has brought two adversary proceedings against T Corp. Technologies to avoid the transfers to it as fraudulent conveyances.  *Nisselson v. T Corp. Technologies LLC et al.*, Adv. Pro. Nos. 06-1762 and 07-1736.

[9] Plaintiffs and Defendants have both asserted that E*Trade wrongfully prevented Amanat from attempting to pursue the Earn Out.

[10] The Trustee has brought an adversary proceeding against EIT to recover as fraudulent any conveyances to it in connection with the B of A proceeds.  *Nisselson v. Epic Inv. Trust*, Adv. Pro. No. 06-1945.

Amanat, was the limited partner of another trust, Epoch Investments Ltd. ("Epoch").[11]

Epoch, now a debtor in another Chapter 11 proceeding in this Court, was originally

formed by Amanat (with the participation of Ashraf) to hold certain of his personal

claims and properties for the benefit of his family. *See* SOF 25-27 and *In re MarketXT*

*Holdings Corp.*, 347 B.R. 156 (Bankr. S.D.N.Y. 2006). The $13.2 million continued to

be recorded on the books and records of Defendant Ash Master Fund as an investment by

EIT from August 22, 2003 until April 2004. In April 2004, after an involuntary

bankruptcy petition had been filed against the Debtor, the EIT investment was re-

registered in the capital account of "Empyrean Investment, LP." Although Empyrean

Investment had been used as a name for Epoch, it was also used as a name for Defendant

Empyrean Investment Fund (defined as "EIF" herein), and there is no dispute that at least

from April 2004, EIF and the other Defendants have treated the proceeds as their

property.

The parties also created the following paper trail for the $13.2 million. At some

point, Defendants signed a letter agreement, dated May 2, 2003, in which the Debtor

purportedly agreed to deliver the proceeds from the Collar transaction to Defendants, and

to treat them, if "retained by" the Debtor, as "an additional loan . . . under the same terms

of the Pledge and Secured Note." (Def. Exh. X.) It appears that this supposed "loan"

was not outstanding for very long because Defendants also assert that Amanat's transfer

of $13.2 million in August 2003 to the EIT account at Ash Master Fund represented a

"prepayment" of debt owed to EIF and resulted in a $9,157,414 prepayment penalty

---

[11] EIT replaced Amanat and Ashraf, who were the original limited partners of Epoch. Plaintiffs' SOF 27
asserts that "Epoch's original limited partners were Amanat and Ashraf. Exh. 29, Epoch LP Agreement.
Shortly after Epoch was formed, Amanat and Ashraf were replaced as limited partners by a Cook Islands
trust called Epic Investments Trust ('Epic' or 'EIT'), which was also settled by Amanat." Defendants
response to this SOF is that they agree with the allegations.

under the Note.  SOF 102.  The record also contains a letter dated August 25, 2003 signed by Ashraf on behalf of EIF purporting to acknowledge receipt of the $13.2 million "prepayment" from the Debtor.  Ashraf has admitted that the letter was backdated and might not have been prepared until some time in 2005, well after the Debtor was in a bankruptcy case.  *See* Plaintiffs' SOF 142, not disputed by Defendants.[12]  However, the record does not show exactly when Defendants first contended that the prepayment penalty entitled them to most of the proceeds of the Collar, as well as the STARS, transaction.[13]

In any event, without the benefit of most of the proceeds of the STARS and Collar transactions, the Debtor remained starved for cash.  On March 26, 2004, an involuntary case was filed against the Debtor under Chapter 7 of the Bankruptcy Code, on December 2, 2004 the Debtor's motion to convert to Chapter 11 was granted, and a Chapter 11 trustee was appointed on January 28, 2005.  On March 17, 2005, the Trustee commenced this action, claiming that the 2003 transfers to EIF were avoidable under Federal and applicable State law as intentional or constructive fraudulent conveyances, that Defendants' claims (if any) should be disallowed or subordinated, and that Defendants were liable for breach of contract and conversion.  A creditors committee that had been appointed on December 16, 2004 and that has actively participated in the case joined as a party plaintiff.

---

[12] Ashraf has admitted that he has used other backdated documents submitted to the Court during the course of these proceedings.  *See In re MarketXT Holdings Corp.*, 2007 WL 680763 at *2, n.4 (Bankr. S.D.N.Y. March 1, 2007).

[13] We do know that on April 29, 2005, Ashraf filed an Amended EIF tax return in which the prepayment penalty was first reported as "income".  This supposedly attributed certain income to Samee Bhatti, who is Amanat's second cousin and was for the first time identified as a limited partner of EIF in that same tax return.  This served as the pretext for Ashraf's transfer of $6.7 million to Bhatti, allegedly to pay Bhatti's Canadian taxes.  *See* 336 B.R. at 55.  As discussed below, Bhatti has absconded with the funds, notwithstanding a Canadian order for his arrest.

At the time of the filing of the Complaint, the Trustee moved for a preliminary injunction (and temporary restraining order) to restrain $16 million that the Trustee alleged to be the proceeds of the STARS and Collar transactions and still in possession of Defendants.  Defendants agreed on the record of a hearing held on March 18, 2005, that they would hold the remaining $16 million in escrow pending further proceedings and subject to certain conditions.  In the midst of extensive hearings on Plaintiffs' request for a preliminary injunction, Defendants disclosed that they had transferred $6.7 million from the escrow to one Samee Bhatti, a Canadian resident and alleged "investor" in EIF, assertedly for the payment of Bhatti's "taxes" on the "income" from the alleged prepayment penalty.  Defendants claimed they had a right to pay Bhatti's taxes under the terms of the escrow.  The Court thereafter took testimony on both the motion for a preliminary injunction and Plaintiffs' motion to hold Defendants in contempt, and by decision dated January 10, 2006, found that the Defendants had willfully and contemptuously depleted the escrow funds and ordered that the $6.7 million be restored.  Defendants have not restored the funds and the recipient of the $6.7 million, Bhatti, has absconded with them notwithstanding an order of arrest from a Canadian court.[14]

Plaintiffs thereafter put aside their motion for a preliminary injunction and after the close of discovery moved for summary judgment in their favor on several counts of the Complaint.  Although Plaintiffs rely on a substantial record, they seek summary judgment principally on the counts of the Complaint that charge that the transfers of the proceeds of the STARS and Collar transactions are avoidable as intentional fraudulent conveyances.  We deal first with the standards for determining motions for summary

---

[14] Plaintiffs later successfully moved for an award of attorneys' fees on the contempt proceeding, and the Court's award was affirmed by the District Court.  2007 U.S. Dist. LEXIS 27008 (S.D.N.Y. April 3, 2007).

judgment, then with Plaintiffs' claims that the transfers were intentional fraudulent conveyances, and finally with the parties' remaining contentions.

## DISCUSSION

I. *Standards for Summary Judgment*

In accordance with Bankruptcy Rule 7056, which incorporates Fed.R.Civ.P. 56, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005).  The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also In re Ames Dep't Stores, Inc.*, 161 B.R. 87, 89 (Bankr. S.D.N.Y. 1993).  A fact is considered material if it might affect the outcome of the suit under governing law.  *See Anderson*, 477 U.S. at 248.  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Notwithstanding the general principles that govern motions for summary judgment, it is understood that "ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind."  *Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196, 201-202 (2d Cir. 1991); *see also State of New York v. N. Storonske Cooperage*

*Co., Inc.*, 174 B.R. 366, 390 (N.D.N.Y. 1994).  On the other hand, it is also well-

recognized that "the summary judgment rule would be rendered sterile … if the mere

incantation of intent would operate as a talisman to defeat an otherwise valid motion."

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985); *see*

*also Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991).  Moreover,

since fraudulent intent is so difficult to prove, the presence of certain "badges of fraud" is

sufficient to prove actual fraudulent intent.  There is thus ample authority to support the

grant of summary judgment to the plaintiff in a case based on intentional fraudulent

conveyance notwithstanding the need to prove intent.  *See Hassett v. Goetzmann*, 10

F.Supp.2d 181, 188 (N.D.N.Y. 1998); *Ackerman v. Kovac* (*In re All American Petroleum*

*Corp.*), 259 B.R. 6, 19-20 (Bankr. E.D.N.Y. 2001); *Breeden v. Bennett* (*In re Bennett*

*Funding Corp., Inc.*), 220 B.R. 743, 752 (Bankr. N.D.N.Y. 1997); *Dillon v. Dean*, 236

A.D.2d 360, 653 N.Y.S.2d 639 (2d Dept. 1997).  Indeed, summary judgment has been

granted in fraudulent conveyance cases even though intent must be proven by clear and

convincing evidence.  *Hassett v. Goetzmann*, 10 F.Supp.2d at 188 (N.Y. law).  *See also*

*U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (N.Y. law); *Glinka v. Bank of Vermont*

(*In re Kelton Motors, Inc.*), 130 B.R. 170, 179 (Bankr. D.Vt. 1991) (finding the clear and

convincing standard applies to § 548(a)(1)(A) actions under Federal law).[15]

---

[15] Since *Grogan v. Garner*, 498 U.S. 279 (1991), when the Supreme Court rejected the clear and convincing standard and held that the burden of proof for exemption to discharge for fraud under 11 U.S.C. § 523(a) is preponderance of the evidence, some courts have adopted this standard for § 548(a)(1)(A) actions.  *See, e.g.*, *In re American Way Service Corp.*, 229 B.R. 496, 525 (Bankr. S.D. Fla. 1999); *Morris v. Midway S. Baptist Church* (*In re Newman*), 183 B.R. 239, 246 (Bankr. D. Kan. 1995); *Thompson v. Jonovich* (*In re Food & Fibre Protection, Ltd.*), 168 B.R. 408, 418 (Bankr. D. Ariz. 1994).  Other post-*Grogan* courts continue to apply the clear and convincing evidence standard.  *See, e.g.*, *Bumgardner v. Ross* (*In re Ste. Jan-Marie*), 151 B.R. 984, 987 (Bankr. S.D. Fla. 1993); *In re Kelton Motors, Inc.*, 130 B.R. at 178.  Since Plaintiffs also assert a cause of action for intentional fraudulent conveyance under New York law, which requires clear and convincing evidence, it will be assumed that this is the applicable standard under § 548(a)(1)(A) for purposes of this decision.

II. *Intentional Fraudulent Conveyance*

Since the transfers of property in connection with the STARS and Collar

transactions took place within one year before the date of the filing of the involuntary

petition, Plaintiffs rely principally on § 548(a)(1)(A) of the Bankruptcy Code, which as

applicable to this case provides as follows:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in
> property, or any obligation incurred by the debtor, that was made or
> incurred on or within one year before the date of the filing of the petition,
> if the debtor voluntarily or involuntarily—
> > (A) made such transfer or incurred such obligation with
> > actual intent to hinder, delay, or defraud any entity to which
> > the debtor was or became, on or after the date that such
> > transfer was made or such obligation was incurred,
> > indebted.[16]

Plaintiffs secondarily invoke the similar provisions of § 276 of the New York Debtor and

Creditor Law ("DCL"), which provides:

> Every conveyance made and every obligation incurred with actual intent,
> as distinguished from intent presumed in law, to hinder, delay, or defraud
> either present or future creditors, is fraudulent as to both present and
> future creditors.

Section 276 and the other relevant provisions of the New York DCL are made applicable

herein by § 544(b) of the Bankruptcy Code, which gives a trustee or debtor in possession

the power to avoid a transfer of an interest of a debtor in property if the transfer is

avoidable under applicable State law by an existing creditor holding an unsecured

claim.[17]

In order to set aside a conveyance as an intentional fraudulent conveyance under

either Federal or State law, the plaintiff is relieved from the need to establish two of the

---

[16] This case is governed by the terms of § 548 prior to the 2005 Amendments to the Bankruptcy Code,
which changed the look-back period under § 548.
[17] There is no assertion on the part of Defendants that there does not exist an unsecured creditor of the
Debtor with a claim that dates to the time when the challenged transfers took place.

most important factors in a case involving constructive fraudulent transfers, insolvency of

the transferor and inadequacy of consideration (or lack of reasonably equivalent value).

*See Sharp Int'l Corp. v. State Street Bank and Trust Co.* (*In re Sharp Int'l Corp.*), 403

F.3d 43, 56 (2d Cir. 2005) ("[W]here actual intent to defraud creditors is proven, the

conveyance will be set aside regardless of the adequacy of consideration given."), citing

*United States v. McCombs*, 30 F.3d at 328 (applying § 276 of the DCL); *Hayes v. Palm

Seedlings Partners-A* (*In re Agric. Research and Tech. Group, Inc.*), 916 F.2d 528, 538

(9th Cir. 1990) (Federal law); *In re Bayou Group, LLC*, 362 B.R. 624, 629-30 (Bankr.

S.D.N.Y. 2007) (Federal and State law); *Huennekens v. Gilcom Corp. of Virginia* (*In re

Sunsport, Inc.*), 260 B.R. 88, 111 (Bankr. E.D.Va. 2000); *T.G.W. Realties v. Long Island

Bird Store*, 151 Misc. 918, 923, 272 N.Y.S. 602, 608 (N.Y. Sup. Ct. 1934) (State law); 5

*Collier on Bankruptcy*, ¶ 548.04[3] (15th ed. 2006).  Moreover, it is well accepted that

intent to hinder or delay creditors is sufficient, and intent to defraud need not be proven.

*See Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932); *Hassett v. Goetzmann*, 10 F.Supp.2d at

188 (DCL § 276); *Flushing Sav. Bank v. Parr*, 81 A.D.2d 655, 656, 438 N.Y.S.2d 374

(2d Dept. 1981) (same); 5 *Collier on Bankruptcy*, ¶ 548.04[1] (15th ed. 2006) ("[A]n

intent merely to delay, but not ultimately prevent, a creditor from being repaid is

generally sufficient to trigger the requisite culpability required by the statute.").

        A transferee may be able to defeat the plaintiff's claims by asserting its own

good faith and establishing that value was given.  Under Federal law, a transferee or

obligee "that takes for value and in good faith has a lien on or may retain any interest

transferred or may enforce any obligation incurred, as the case may be, to the extent that

such transferee or obligee gave value to the debtor in exchange for such transfer or

obligation." 11 U.S.C. § 548(c). The transferee's "good faith" and value given "in exchange" is an affirmative defense under § 548(c) that the transferee must plead and prove. *See*, *e.g.*, *In re M& L Bus. Machine Co., Inc.*, 84 F.2d 1330, 1338 (10th Cir. 1996); *In re Bennett Funding Group, Inc.*, 232 B.R. 565, 572-73 (Bankr. N.D.N.Y. 1999); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Financial Technologies Ltd.*), 337 B.R. 791, 806 (Bankr. S.D.N.Y. 2005). Under New York law, there are cases that indicate that the plaintiff has the burden of proving the intent of the transferee as well as the transferor under DCL § 276. *See* discussion in *In re Actrade Financial*, 337 B.R. at 808. On the other hand, in *HBE Leasing v. Frank*, 61 F.3d 1054, 1059, n. 5 (2d Cir. 1995) ("*HBE Leasing II*"), the Second Circuit referred only to the intent of the transferor in a case under § 276. *See also SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999). In any event, it is established under New York law that in an intentional fraudulent conveyance case the relevant inquiry is whether the transferee had either "an actual or constructive knowledge of the fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) ("*HBE Leasing I*"); *see also Sullivan v. Messer* (*In re Corcoran*), 246 B.R. 152, 161 (E.D.N.Y. 2000); *Actrade Financial*, 337 B.R. at 810. Moreover, the issue of burden of proof is of less importance on this motion for summary judgment brought by Plaintiffs, as all inferences from the facts of record must be drawn in favor of Defendants, and Plaintiffs bear the burden of proving both that (i) Amanat had an intention to "hinder, delay or defraud" creditors, and (ii) that any reasonable trier of fact would have to reject Ashraf's protestations that he did not have actual or constructive knowledge of Amanat's intent and that Defendants contributed

value to the Debtor in good faith in exchange for the two transfers aggregating $28.7 million.

In order to satisfy their burden of demonstrating an intention to "hinder, delay or defraud creditors," by clear and convincing evidence, to negate Ashraf's defenses of good faith and value, and to demonstrate their entitlement to summary judgment, Plaintiffs rely on (i) an affidavit from Amanat in which he admitted that the STARS and Collar transactions were designed to delay creditors of the Debtor, and (ii) the doctrine that an intentional fraudulent conveyance can be proven by the presence of "badges of fraud." Plaintiffs also rely on Ashraf's admissions in response to this motion for summary judgment.

*The Amanat Affidavit*

The affidavit of Omar Amanat was sworn to April 26, 2006 and originally submitted to the Court in connection with Plaintiffs' motion to sever the case against certain of the Defendants and proceed to an immediate bench trial against other Defendants, who had allegedly waived their right to trial by jury.[18]  The Amanat affidavit makes, first, a general statement that

> I, acting on behalf of the Debtor and in concert with Rauf Ashraf, EIF and EGP [the general partner of EIF], caused the transfer of the Debtor's E*Trade stock to EIF and EGP with the intent to delay Softbank and the Debtor's other creditors.  Although I believe I acted in good faith with the ultimate goal of benefiting the Debtor and the Debtor's creditors through those actions, I, acting together with Mr. Ashraf, EIF and EGP, took those actions with that specific intent nonetheless."  ¶ 2.

---

[18] This motion was denied in connection with the opinion dated January 10, 2006, reported at 336 B.R. 39 (Bankr. S.D.N.Y. 2006).  The Court found, among other things, that Defendants had not waived their right to a trial by jury of the Plaintiffs' intentional fraudulent conveyance claims and that some of the Defendants were not bound by any jury waiver.  336 B.R. at 61-64.

Amanat goes on to state that after January 27, 2003, the Debtor's financial situation was desperate, that "the Debtor had no cash, bills could not be paid, [and] a multitude of lawsuits against the Debtor were proceeding and rapidly resulting in default judgments." (¶ 3.)  Amanat identifies certain of the creditors, in addition to Softbank, as including Tanzman, Rock & Kaban, L.L.C. ("TRK") (pressing for immediate payment of more than $10 million), Triton Global LLC (claiming that it was entitled to immediate payment of $2 million), and "also, as the Court is aware from the prior testimony during the preliminary injunction hearing, a multitude of creditors, some already possessing default judgments against the Debtor, were pressing for payments which totaled in the millions of dollars."  (¶ 5.)

After these representations relating to the Debtor's financial condition, Amanat elaborates on his intent with regard to the STARS and Collar transactions.  He states that it appeared that B of A was prepared to engage in transactions involving the Debtor's E*Trade stock that could generate up to $35 million and continues:

> I needed a substantial portion of those monies (i) to try to restart the MarketXT Inc. business, (ii) to help place a large volume of trades through the Momentum Division of E*Trade which would have assisted in achieving the earn-out; and (iii) if necessary, to fund litigation against E*Trade should E*Trade continue to persist in its bad faith actions to prevent the earn-out.  However, I knew that if the Debtor entered into the transactions with Bank of America directly, most of the proceeds thereof would be immediately grabbed by Softbank, and the remainder, if any, would be taken by the Debtor's other creditors.  That would have resulted in the loss of all of the value which I have just described. (¶ 4.)

Amanat goes on:

> In light of this reality, I had to figure out a way to do the transactions with Bank of America, while shielding a major portion of the proceeds from those transactions from Softbank and from the Debtor's other creditors. That is where Rauf Ashraf and EIF and EGP came in….In February 2003, I came up with the plan for EIF to be formed as a hedge fund, which

would, in turn, serve as the vehicle through which the Debtor would engage in the Bank of American transactions. I explained the plan to Mr. Ashraf and implemented the plan with him. The Debtor would transfer all of its E*Trade stock to EIF as 'collateral' for a 'loan' from EIF to the Debtor in an amount of up to 50% of the market value of that stock. EIF would, in turn, transfer that stock to Bank of America and receive close to 100% of the stock's market value (which ended up totaling over $40 Million). The difference between the amount received by EIF from Bank of America (over $40 Million) and the amount 'loaned' by EIF to the Debtor ($21.1 Million) was supposed to be used by EIF and Mr. Ashraf in Mr. Ashraf's hedge fund subject to my instructions….During the Summer of 2003, Mr. Ashraf's hedge funds did try to open accounts at the Momentum Division of E*Trade so that a large number of transactions could be placed through that entity. However, E*Trade's management blocked those attempts. Ultimately, through a series of maneuverings over the course of a number of months, Mr. Ashraf asserted control over most of the proceeds of the STARS and COLLAR transactions and denied (and continues to deny) that those funds constitute property of the Debtor. (¶ 6, 7.)

*The Alleged Badges of Fraud*

In addition to the Amanat affidavit, Plaintiffs rely on the principle that an intention to hinder, delay or defraud creditors can be established by circumstantial evidence through proof of certain "badges of fraud." Badges of fraud are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent", and they are allowed as proof "due to the difficulty of proving actual intent to hinder, delay or defraud creditors." *In re Sharp Int'l Corp.*, 403 F.3d at 56, quoting *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dept. 1999). The existence of several badges of fraud can constitute clear and convincing evidence of actual intent. *In re Actrade Financial Technologies*, 337 B.R. at 809, citing 4 *Collier on Bankruptcy* ¶ 548.04[2] (15th ed. 1983).

The Second Circuit has identified common badges of fraud in a number of cases, including *In re Sharp. Int'l Corp.*, 403 F.3d at 56; *HBE Leasing Corp. I*, 48 F.3d at 639;

and *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983); *see also Wall St. Assocs. v. Brodsky*, 257 A.D.2d at 529, 684 N.Y.S.2d at 247; *In re Actrade Fin. Techs.*, 337 B.R. at 809.  Plaintiffs rely on a number of these badges as follows:

1.  The financial condition of the transferor at the time of the transfer.  *See In re Kaiser*, 722 F.2d at 1582, citing *In re May*, 12 B.R. 618, 629 (Bankr. N.D. Fla. 1980).  Plaintiffs point to the desperate financial condition in which the Debtor found itself prior to the transfer.  Defendants do not dispute that the Debtor's condition was "pitiful" and that it was operating under "dire circumstances" at the time of the challenged transfers.  (Def. Memo of Law, pp. 5, 13.)

2.  Concealment of facts and false pretenses by the transferor. *In re Kaiser*, 732 F.2d at 1582, quoting 4 *Collier on Bankruptcy* at ¶ 548.02[5].  There is no dispute that creditors were informed of the Pledge Agreement, requiring payment of most of the proceeds of any re-hypothecation of the E*Trade stock to the creditors themselves, and of the initial terms of the note given by the Debtor to EIF, providing for an 8% interest rate and no prepayment penalty.  Plaintiffs contend that creditors were not informed of the subsequent, onerous terms of the Note as revised by Amanat and Ashraf, with its 19% interest rate and imposition of a huge prepayment penalty, or of the $15.5 million in proceeds of the STARS transaction not distributed to creditors.  Plaintiffs also claim that creditors were entirely uninformed about the Collar transaction.  As discussed below, Defendants have submitted no evidence to the contrary.

3.  An unconscionable discrepancy between the value of the property transferred and the consideration received; *i.e.*, inadequacy of consideration.  *See Sharp*, 403 F.3d at 56; *In re Kaiser*, 722 F.2d at 1582; *see also Geltzer v. Artists Marketing Corp.* (*In re*

*Cassandra Group*), 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006). Plaintiffs state that, at

best, Defendants agreed to "lend" back to the Debtor only the proceeds of its own

property and that, by virtue of the creation of a prepayment penalty and a four-year term

for the "loan," Defendants took most of the value for themselves over and above the

share of the proceeds paid directly to Softbank and a few other creditors. Defendants'

assertions that their services were worth more than $22 million are further discussed

below; for purposes of establishing a *prima facie* badge of fraud, it is clear that the cost to

the Debtor of the transfers was enormous.

4.    A close relationship between the parties to the alleged fraudulent transaction.

*See Sharp*, 403 F.3d at 56; *Kaiser*, 722 F.2d at 1582. Plaintiffs point to email

correspondence between Amanat and Ashraf as evidencing a lack of a true arm's length

relationship. For example, when Ashraf learned that Amanat was contemplating entering

into the Collar transaction directly with B of A, he emailed Amanat, stating, "WHAT

ABOUT THE other 2.5 million shares …send them over so I can clean them ALL!!

HAHA." (Plaintiffs' Exh. 62.)[19] Defendants dispute the inferences that Plaintiffs draw

from the emails but not the emails themselves.

5.    The transferor's reservation of rights in or control over the transferred property

after the alleged conveyance. *See Sharp*, 403 F.3d at 56, citing *Wall St. Assocs.*, 257

A.D. at 529, 684 N.Y.S.2d at 247. There is no dispute that Amanat retained rights in the

transferred funds, as Defendants' main defense is that the transfers were designed to

allow the Debtor to utilize the proceeds of the STARS and Collar transactions to trade

with Amanat's former subsidiary, Momentum, and achieve the Earn Out.

---

[19] As will be seen below, Amanat did not send them over to Ashraf for cleaning, but Ashraf nevertheless
claims the proceeds.

In sum, there is ample *prima facie* evidence in the record of the "badges of fraud" that constitute evidence of an intent to "hinder, delay or defraud" creditors.

*Defendants' Response and Admissions*

(i) Attack on the Amanat Affidavit

Defendants have submitted an extensive response to Plaintiffs' motion, with an affidavit of Ashraf backed by voluminous exhibits and a point-by-point response to Plaintiffs' Rule 7056-1 Statement of Undisputed Facts.  With respect to the Amanat affidavit, Defendants' counter-attack has taken several forms.  One has been to claim the affidavit was the product of duress and that Amanat was not competent to sign it. Ashraf's declaration in opposition to Plaintiffs' motion states, "Amanat indeed told me that in his latest affidavit (Exhibit T) he was forced by the Plaintiffs to artfully describe the events to which he testified in order to best support the Plaintiffs' case, as opposed to a more straightforward presentation." (¶ 13.)   After the instant motion had been fully briefed and submitted, Defendants took a telephonic deposition of Amanat, ostensibly in connection with a default judgment they had obtained against Bhatti in Massachusetts.[20] Defendants adduced some testimony from Amanat that they claimed raised an issue of duress and Amanat's competence to sign the affidavit, and they moved to reopen the record on this motion and to take further deposition testimony from Amanat.  The Court ordered such a deposition and directed that the deposition take place in the courtroom, so that it would not be delayed.

---

[20] The lawsuit in Massachusetts, brought against Bhatti, who had already absconded from his home in Canada and had been traced to the Middle East and Europe, was commenced by Defendants, assertedly for the purpose of demonstrating their good faith efforts to purge their contempt for having transmitted $6.7 million to Bhatti in violation of the Court order described above.

On the question of duress and competence, the continued Amanat deposition made it clear beyond doubt that although Amanat was under emotional strain as a consequence of the failure of the Debtor and its affiliates and their subsequent bankruptcies, he was competent to give the affidavit in question and was not under any improper duress.  The evidence clearly established that when Amanat signed the affidavit, he was represented by his personal counsel, that he went over the text of the affidavit with great care, and that his requested changes were all made.[21]  Plaintiffs obviously pressed him to provide the affidavit, and not to put off the signing, and there is no question that they had been pursuing his cooperation, but there was no improper duress that would preclude use of the affidavit on this motion.  *See Willgerodt ex rel. Majority Peoples' Fund for the 21st Century, Inc. v. Hohri*, 953 F.Supp. 557, 560 (S.D.N.Y. 1997) (depression did not cause lack of contractual capacity or irrational behavior beyond control to void settlement agreement for duress); *Batac Development Corp. v. B & R Consultants, Inc.*, 1999 WL 76873 at *5 (S.D.N.Y. Feb. 16, 1999) (no duress in a "heated, stressful and contentious negotiation" where no physical threats made and intimidated party was free to leave and had other legal remedies to avoid the duress); *In re Stamell*, 252 B.R. 8, 20 (Bankr. E.D.N.Y. 2000) (finding no duress when party had access to independent legal counsel to review the agreement).

Indeed, the changes that Amanat made in the affidavit before he signed it in April, 2006, are all consistent with one of the points that Defendants rely on in opposition to this motion.  In his affidavit Amanat emphasizes that he had no intention to "defraud" or

---

[21] In relying on the deposition of Amanat taken in open court, the Court is nonetheless refraining from resolving any issues of credibility based on its observation of the testimony.  The Court has observed Amanat and Ashraf on the stand on several occasions, but on this motion for summary judgment, all inferences are being drawn in Defendants' favor.  Disputed facts are resolved in Plaintiffs' favor only when no reasonable or rational trier of fact could find otherwise.

even to "hinder" creditors, and the record shows that he required that the word "hinder"

be deleted from an earlier draft of his affidavit.  Amanat admitted only to "delay," and he

continues to insist that his agreements with Defendants were made with the long-term

goal of retaining funds so that the Debtor would be able to achieve the Earn Out or, if

necessary, litigate with E*Trade and Softbank.  This is completely consistent with

Defendants' admissions as to the facts, as set forth in Ashraf's declaration submitted in

opposition to this Motion:

> I believe TCORP [the Debtor] should not have taken actions which
> destroyed its chances of achieving the earnout in order to deliver benefits
> primarily to Softbank.  Had TCORP entered into such a deal directly with
> Bank of America, TCORP would have realized no benefit from the cash
> generated.  Virtually all cash generated from the transaction would have
> been seized by Softbank with other creditors receiving the remainder
> (Exhibit I)….Amanat admitted this in his affidavit of April 26,
> 2006…Instead, by entering into the deal with EIF, TCORP increased its
> opportunity to realize its most valuable asset:  the earnout.  It was my
> understanding that preservation of liquidity had the potential to keep alive
> an 'earn-out' worth upwards of $800+million….

Decl. ¶¶ 10, 11.  Defendants' first line of defense, in brief, is that the transactions were

designed to delay creditors, for their own good, by preventing Softbank from seizing

most of the proceeds and permitting the Debtor to use the proceeds to achieve higher

earnings from the Earn Out.

 The flaw in Defendant's argument is that an admitted intention to delay creditors

is not immunized by the transferor's conviction that it is for the creditors' good and the

debtor, if only given time, will be able to recover enough to pay them all.  The possible

reward does not justify the transaction where there is intent to delay creditors.  *Shapiro v.

Wilgus*, 287 U.S. 348 (1932), invoking general principles of fraudulent conveyance law

as well as the State statute applicable there, is particularly instructive on this point.  In

*Shapiro*, the debtor, a Philadelphia lumber dealer, was unable to pay his debts as they matured but believed that if he had more time, he could meet his obligations. After unsuccessfully negotiating with his creditors for extensions, the debtor decided to obtain the appointment of a receiver to stay collection proceedings. He created a Delaware corporation and transferred all of his business assets to this corporation in exchange for all of the corporation's stock. *Id.* at 352. He did this to skirt Pennsylvania law, which did not permit appointment of a receiver for a business run by an individual. *Id.* The debtor subsequently sued the new corporation, alleging that "creditors were pressing for immediate payment . . . and that the business, if protected from the suits of creditors and continued without disturbance could be made to pay the debts and yield a surplus of $100,000 for the benefit of stockholders." *Id.* at 353. The Federal court appointed a receiver, but the Supreme Court held that this was error.

In *Shapiro*, as in the present case, even if the debtor's aim was "to prevent the disruption of the business at the suit of hostile creditors and to cause the assets to be nursed for the benefit of all concerned," the transfer was still avoidable. *Id.* at 354. Justice Cardozo explained that while "a conveyance is illegal if made with an intent to defraud the creditors of the grantor . . . equally it is illegal if made with an intent to hinder and delay them." *Id.* A debtor might have the best of intentions and a "genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full." *Id.* However, "the belief even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay." *Id.*

This principle is equally valid even where the parties to an intentional fraudulent conveyance hold the "genuine belief" that there are defenses to the creditors' claims and

that one or more creditors has been needlessly overbearing in refusing forbearance. For

example, Defendants argue that the Debtor had defenses to Softbank's claims,

notwithstanding the fact that Softbank was actually paid $11.6 million in connection with

the closing of the STARS transaction.[22]  Such after-the-fact assertions are not sufficient

to protect a scheme otherwise designed to hinder or delay creditors.  *See*, *e.g.*, *Shapiro v.*

*Wilgus* (focusing the inquiry solely on whether the debtor intended to delay or hinder his

creditors); *Pereira v. Checkmate Commc'n, Inc.* (*In re Checkmate Stereo and*

*Electronics, Ltd.*), 9 B.R. 585, 614-15 (Bankr. E.D.N.Y. 1981) (finding after-the-fact

excuses for secreting away the assets of the debtor-companies without notifying creditors

insufficient to constitute a fraudulent conveyance defense and listing a long litany of

cases where owners of failing businesses hid assets from creditors).

Moreover, even if there were defenses to Softbank's claims, there were numerous

other creditors holding claims against the Debtor that are not challenged in Defendants'

papers.  For example, Plaintiffs assert that TRK was demanding immediate payment on

$1.5 million in Notes and $10.5 million owed pursuant to an April 8, 2002 agreement;

that Scott Ignall commenced a suit against the Debtor on February 18, 2003, seeking

millions of dollars in damages; and that Triton Global LLC commenced a suit on March

12, 2003, seeking $4.3 million based on an April 8, 2002 agreement with the Debtor.

---

[22] Defendants note that the Trustee filed a complaint against Softbank in these Chapter 11 proceedings seeking to avoid the $11.6 million payment it received in connection with the STARS transaction as an intentional or constructive fraudulent conveyance, and also to void the earlier settlement with Softbank as the product of "duress".  This Court dismissed Plaintiffs' claims based on the allegation "that a creditor's insistence on its right to payment constitutes a *prima facie* scheme to 'hinder or delay' other creditors within the meaning of the fraudulent conveyance laws," and it also dismissed the counts alleging duress. *Nisselson v. Softbank AM Corporation* (*In re MarketXT Holdings Corp.*), 361 B.R. 369, 396, 400 (Bankr. S.D.N.Y. 2007).  However, it gave Plaintiffs leave to replead certain counts, and the Plaintiffs later settled their claims against Softbank.

SOF 19, 20.  Defendants' sole response to Plaintiffs' SOF 19 is agreement and the

following relating to SOF 20 (the facts regarding Ignall and Triton):

> Defendants agree with so much of the allegations set forth in this
> paragraph, as states suits were commenced.  Whether in fact the plaintiffs
> in said suits were creditors is a question of law.  (Defendants' Response to
> SOF 20.)

This is not a challenge to the asserted fact.  Based on the entire record, the Court finds as

a matter of law that the Debtor had numerous creditors that Amanat and Ashraf intended,

at the very least, to delay.  Thus, Defendants' attack on the Amanat affidavit is, on the

whole, unavailing.[23]

> (ii)  The Badges of Fraud

Defendants' response to Plaintiffs' contention that the transfers were marked by

numerous "badges of fraud" is voluminous but likewise unavailing.  There is no dispute

regarding the first of Plaintiffs' badges mentioned above, that the financial condition of

the Debtor was desperate at the time of the STARS and Collar transfers.  Defendants term

the Debtor's financial condition at the time as "pitiful" (Def. Memo of Law, p. 5), and

indeed argue that the state of the Debtor's finances justified the price that the Debtor paid

for the Defendants' "services."  We deal with that contention below; in any event, there is

no question that the Debtor was in desperate financial straits at the time of the challenged

transfers.  Moreover, there is no dispute that the Non-Escrow E*Trade Stock represented

virtually all of the Debtor's disposable property.

---

[23] In a Supplemental Memorandum dated August 22, 2007, filed after the in-court deposition of Amanat, Defendants make much of the allegedly "profound and significant" fact that Amanat stated that he would have preferred to use the words "certain other creditors" rather than "other creditors" when he referred in his affidavit to the parties he intended to "delay."  (Supplemental Memo pp. 6-7.)  The significant fact is that there were many creditors who were unpaid and intentionally delayed by the actions of Amanat and Ashraf.

With respect to the second badge of fraud, concealment of facts and false pretenses, Defendants point to the fact that creditors were aware of the original Pledge Agreement and that they knew that EIF would be a middleman, that it would receive consideration, and that a large share of the proceeds of any re-hypothecation of the Non-Escrow E*Trade Stock would be paid to Softbank.  Defendants do not, however, cite any evidence in the record that creditors were informed about the Collar transaction or about the change in the terms of the Note that gave rise to the enormous prepayment penalty on which Defendants base their claim to most of the net proceeds of the transactions.[24]

The record is conflicting as to the date when the Note was changed and the prepayment penalty was first inserted.  There is some evidence that Amanat and Ashraf agreed to the onerous terms of the Note, including the prepayment penalty, after E*Trade had disparaged Amanat in a conference call just before the STARS transaction closed. *See* this Court's opinion on the Plaintiffs' contempt proceeding, 336 B.R. at 46 ("E*Trade appears to have disparaged Amanat in this conversation, after which Amanat and Ashraf apparently agreed…").  The expanded record on the present motion contains evidence that the prepayment penalty was not concocted until well after both the STARS and Collar transactions had closed.[25]  Suffice it to say, for purposes of establishing the second badge of fraud, when all inferences must be drawn in Defendants' favor, that

---

[24] Defendants refer to this issue in paragraph 8 of the Ashraf declaration in opposition to the summary judgment motion, where he states that the four-year 19% note was acknowledged in a "2004 filing" (not identified) and assert that all parties "had sophisticated counsel" review the original papers.  Not one of Ashraf's exhibit references, however, supports the proposition that creditors were informed of the prepayment penalty or that creditors' counsel, no matter how sophisticated, could have known that Amanat and Ashraf had drastically changed the terms of the transaction.

[25] Defendants admit that the revised Note was sent to Amanat by Defendants' lawyers "a few months" after March 28, 2003, but they assert that both parties agreed to the terms on March 28.  (Def. Memo of Law, p. 56.)  In any event, Defendants' 72-page Memorandum of Law in opposition to the motion for summary judgment contains no statement, much less evidence, that the onerous terms of the transaction were made known to creditors contemporaneously.

there is clear and convincing evidence that the revised terms of the Note were concealed from creditors, but it is not clear when Amanat and Ashraf agreed to the more onerous terms of the transaction, and it will be assumed that they did so before the transactions closed.

The third badge of fraud on which Plaintiffs rely is the inadequacy of consideration given by Defendants. For purposes of their case-in-chief, Plaintiffs have made a *prima facie* case that the Debtor received very little from Defendants. Nevertheless, Defendants assert in connection with their defense that they gave "value" to the Debtor and that the potential rewards from of the Earn Out justified the cost. In Defendants' words, "it is incumbent upon Plaintiffs to demonstrate that there can be no countervailing financial considerations, or stated more precisely, that the preservation of the Earn Out potential was worth far less than the approximately $22,000,000 it cost." (Def. Memo of Law, p. 23.) Defendants are correct in that Plaintiffs must, on this motion for summary judgment, overcome Defendants' defense under § 548(c) of the Bankruptcy Code (and analogous State law) that they gave value to the Debtor in good faith in exchange for the transfers. We deal with that issue below. For purposes of establishing the relevant "badge of fraud," Plaintiffs have introduced clear and convincing evidence that Defendants received little in exchange for $22,000,000.[26]

The fourth badge of fraud relied on by Plaintiffs is the close relationship between Amanat and Ashraf at the time of the transactions complained of. There is much friendly email correspondence between them, but there were no family ties and the relationship

---

[26] The two transfers that Plaintiffs are attempting to avoid, at least $15.5 million in connection with the STARS transaction and $13.2 million in connection with the Collar transaction, aggregate $28.7 million. Defendants have never explained on what basis they claim the difference between $22 million and $28.7 million.

commenced on a business basis.  On the other hand, it has been clearly established that

Amanat and Ashraf each had interests in the enterprises that were ostensibly controlled

by the other.  For example, Ashraf was deeply involved in Epoch, the vehicle that

Amanat set up for the benefit of his family.[27]  Ashraf was not removed as the sole trustee

of the trust which was the general partner of Epoch until October 8, 2003.[28]  Both

Amanat and Ashraf had interests in EIT, the 99% limited partner of Epoch and the holder

of the $13.2 million in Collar transaction proceeds from August 2003 to April 2004.

Conversely, Amanat had interests in Ashraf's companies, at least at their

inception.  For example, Amanat was the sole initial member and co-manager (with

Ashraf) of EGP, EIF's general partner.  Defendants argue that this was a "mistake," but it

is consistent with additional evidence that Ashraf and Amanat were working together not

only in connection with the challenged transfers but also in connection with the formation

of Ashraf's companies.  Part of the record here consists of a trial that the Court conducted

in October 2006 with respect to Plaintiffs' objection to a proof of claim that EIF had filed

against Epoch.  In that decision the Court found for Ashraf and EIF on the ground, among

others, that "Whatever the bona fides of the transactions between MarketXT and EIF, it is

not contested that Amanat and Ashraf were acting together closely, both in connection

with the transactions between MarketXT and EIF and in connection with other business

relationships . . . . there were many different business relationships between Amanat and

Ashraf and the companies they controlled, a close relationship between the two men, and

---

[27] The formation of Epoch is also described in this Court's decision of August 11, 2006, which denied EIF's motion to dismiss the *Epoch* case.  *See* 347 B.R. 156 (Bankr. S.D.N.Y. 2006).

[28] Ashraf was also removed as a signatory over Epoch's principal bank account at Bank Sarasin and authority was transferred to Amanat's wife, in October or November 2003.  *See* SOF 76; 2007 WL 680763 at *3, n. 7.

a frequent transfer of funds back and forth between the companies." 2007 WL 680763 at

*3, 4 (Bankr. S.D.N.Y. Mar. 1, 2007).[29]

There is not much dispute with respect to the fifth badge of fraud, whether the

transferor (Amanat) retained rights of control over the transferred property. Defendants'

principal defense is that the transferred funds were going to be used to trade securities for

the benefit of the Debtor and its creditors, not for the benefit of Defendants. This trading

program was to be directed by Amanat, at least behind the scenes, and Defendants say it

failed because E*Trade took the position that any trades in which Amanat was involved

would not count toward the Earn Out or would not be allowed. There is also no question

that the Collar transaction proceeds were transferred first to entities controlled by Amanat

and his brother, then to an entity controlled jointly by Amanat and Ashraf, and only in

2004 to EIF, which by then appears to have been under Ashraf's effective control.

In conclusion, based on the foregoing, the record in support of Plaintiffs' motion

for summary judgment constitutes clear and convincing evidence of multiple "badges of

fraud" in connection with the STARS and Collar transfers. Plaintiffs have made out a

case that the challenged transfers were intentionally designed to hinder and delay

creditors of the Debtor, that Ashraf had knowledge thereof, and that Ashraf's acts can be

imputed to all of the other Defendants. The Defendants claim nevertheless that they gave

value to the Debtor and acted in good faith, and that these issues cannot be determined

adversely to them on this motion for summary judgment. We turn to that contention

next.

---

[29] In that decision, the Court found for Ashraf and EIF because, among other things, Debtors were primarily relying on the doctrine of conversion and the objectors could not prove that Ashraf and Amanat had not agreed to the conveyances to EIF. The decision made the point that the objectors were not proceeding on an avoidance theory, which is the principal cause of action here.

*Defendants' Defense of "Value" Given in Good Faith*

Defendants claim that they gave value to the Debtor and acted in good faith, within the meaning of § 548(c) of the Bankruptcy Code and applicable State law. As Defendants put it in their Memorandum of Law, "The essence of Defendants' argument is that the combination of transactions the Debtor undertook created desperately needed liquidity." (Def. Memo of Law, p. 5.) Again: "And this is the fulcrum of the defense, i.e., had the Earn Out, or even a fraction of it been achieved, not only would there be no bankruptcy, but the Empyrean Defendants would have been heralded as champions." (Def. Memo of Law, p. 8, n.6.) Since Defendants are entitled to have all inferences read in their favor on this motion, they do not have to be heralded as champions in order to defeat the summary judgment motion, but only to raise a triable issue of fact as to value and good faith. Unless Plaintiffs can establish as a matter of law that no reasonable trier of fact could conclude that Defendants gave value in good faith in exchange for the challenged transfers, Plaintiffs are not entitled to summary judgment in their favor.

Defendants' principal contention on the issue of value and good faith is that without their intercession, the Debtor would not have been able to preserve any chance of achieving the Earn Out. They point out that Plaintiffs have themselves valued the Earn Out as being worth as much as $180 million and argue that even a small chance of earning this sum would have justified diversion of the funds from immediate application to the Debtor's outstanding debts. Plaintiffs counter that the speculative possibility of a reward in the future is not value. They state that the definition of value in § 548(d)(2)(A) of the Bankruptcy Code excludes "an unperformed promise to furnish support to the debtor" and note a number of cases that have held that value does not include executory

promises of future consideration.  *See Pergament v. Reisner* (*In re Reisner*), 357 B.R.

206, 214 (Bankr. E.D.N.Y. 2006), quoting 5 *Collier on Bankruptcy*, ¶ 548.05[1][b],

where the Court said, "The language of Section 548(d)(2)(A), seeming to contemplate

only a present advance, or transfer of security for, or the discharge of an antecedent debt,

generally leaves no room for a mere executory promise to constitute value."[30]  *See also In

re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 466-67 (S.D.N.Y. 2001) (ownership

interest in stocks with little fair market value but contractual right to force buy-in is a

speculative executory promise and not value under § 548(d)(2)(A)); *Wootten v. Ravkind*

(*In re Dixon*), 143 B.R. 671, 681 (Bankr. N.D. Tex. 1992) (transfer to attorney for legal

defense costs in connection with prospective lawsuit not for value where lawsuit had not

been commenced and services were not provided before bankruptcy filing).

On the issue of value, Defendants rely on *Mellon Bank, N.A. v. Official

Committee* (*In re R.M.L., Inc.*), 92 F.3d 139 (3d Cir. 1996), but their reliance is

misplaced.  In that case, a bank had issued a loan commitment to the debtor, and the

debtor had made three payments in connection with its loan application, two good faith

deposits and a third payment representing a facility fee and agent's fee for syndication of

the loan.  *Id.* at 143.  Ten days after the final payment, after the bank had learned that the

major equity investor had decided to withdraw from the debtor, "the entire deal

collapsed."  *Id.* at 144.  The Committee of Unsecured Creditors filed an adversary

proceeding to recover the good faith and fee payments as fraudulent transfers.  The Court

---

[30] *Reisner* discusses the only Second Circuit decision it found relating to the issue, a Bankruptcy Act case considering whether "fair consideration" had been given under the New York DCL.  *Harper v. Lloyd's Factors, Inc.*, 214 F.2d 662, 663 (2d Cir. 1954).  In that case, the plaintiff trustee tried to set aside a promissory note, given to enable the debtor to get a trade discount for buyers who paid by note, as a fraudulent conveyance.  The Circuit Court found that fair consideration was given because "the entire contract was carried out and the promise was executed" and the promise had been performed within five days from when it was given and "substantially before the bankruptcy."  *Id.*

found that the bank's loan commitment provided "value" to the debtor within the meaning of § 548 of the Bankruptcy Code even though there was a small chance that the loan would ever be made, and concluded that a "mere expectation" of benefit "would suffice to confer 'value' so long as the expectation was 'legitimate and reasonable.'" 92 F.3d at 152, quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992).[31] Without such expectation, the Court found creditors would not be protected "when an irresponsible debtor invests in a venture that is obviously doomed from the outset." *Id.*

In this case, the Debtor could not have had a "legitimate and reasonable" expectation of benefit from a transaction that transferred all of its non-contingent assets to Defendants in return for a vague, speculative promise, never performed, to let the Debtor have the use of some of the funds to trade in securities. *See In re Tri-State Paving, Inc.*, 32 B.R. 2 (Bankr. E.D.Pa. 1982), where the corporate debtor and its officers were found liable for withdrawing all of the funds in the company's bank account and taking them to Las Vegas with the goal of winning enough money to solve all their financial problems.[32] This is not a case, like *R.M.L.* where a third party provided financing or a commitment for financing in the future. Defendants did not contribute or agree to contribute any of their own funds to obtain the benefits of the Earn Out.

---

[31] The Court concluded in *R.M.L.* that although "value" had been contributed, the bank had not contributed "reasonably equivalent value". As further discussed below, that term is used to determine whether a transfer constitutes a constructive fraudulent conveyance under § 548(a)(1)(B) of the Bankruptcy Code and is not relevant to the question whether a conveyance is intentionally fraudulent under § 548(a)(1)(A) or whether a defendant can sustain a defense under § 548(c).

[32] Defendants cite on their behalf a fraudulent conveyance case in which a trustee unsuccessfully sued a large casino on the theory that it took the debtor's money and gave no value in return. *In re Chomakos*, 69 F.3d 769 (6th Cir. 1995). The Court found that the casino had given value to the Debtor by providing him with a lawful chance to win. Its reasoning does not justify the diversion of company assets present in this case.

Moreover, the Debtor always had a legitimate alternative – the alternative it was forced into by the involuntary bankruptcy case filed against it in 2004 – to commence a case under Chapter 11.  In the present bankruptcy case it has been able to pursue its claims against both E*Trade and Softbank, as well as attempt to preserve the proceeds of the STARS and Collar transactions for the benefit of creditors.

Notwithstanding the fact that it is clear on this record that Defendants did not provide value in good faith by purporting to preserve a chance to achieve the Earn Out, there is evidence in the record that Defendants may have provided some "value" to the Debtor in connection with the STARS transaction.  As the facts relating to the Collar transaction are quite different, we first consider the defense with respect to the STARS transaction and thereafter consider it with respect to the Collar transaction.

(i) *The STARS Transaction*

As Defendants argue, EIF was an intermediary between the Debtor and B of A in the STARS transaction, and there is evidence that it facilitated the transaction. Defendants rely in particular on excerpts from a deposition of an officer of B of A taken in connection with litigation over the involuntary filing in this case; the officer testified that the Bank "took some comfort from the fact that the shares were transferred into Empyrean's name and delivered to the bank and the issuer knew that was taking place." (See Test. of Robert Dilworth of B of A, Defs. Exh. N, p. 55, lines 14-17.)  Plaintiffs contend that Dilworth's evidence would not be admissible at trial of this action and that another officer of B of A testified that the Bank was prepared to do the STARS transaction directly with the Debtor but inserted Empyrean (EIF) only at Amanat's request.  (Reply Memo, pp. 19-20, n. 23.)   Whether or not there is a legitimate

evidentiary issue over Dilworth's testimony, there is other evidence in the record that brokerage firms had refused to participate in the liquidation of the Debtor's E*Trade stock, even though the Debtor's stock had been registered for SEC purposes as of November 27, 2002.  (See Defs. Exh. I-1, Dep. Test. of Amanat, June 9, 2005, at p. 13, lines 10-16.)[33]  Plaintiffs have also sued E*Trade on the theory that it tortiously attempted to prevent the Debtor from disposing of the stock and disparaged it when it attempted to sell the shares.[34]  Although Plaintiffs now reject the proposition that EIF provided any value and contend that B of A was willing to effect the STARS transaction without EIF's participation, EIF has raised a legitimate factual issue as to whether its participation in the STARS closing contributed value to the Debtor and as to whether it acted in good faith in connection therewith.

Furthermore, Defendants have submitted in opposition to the summary judgment motion a one-page declaration from Michael Wimmer, dated January 17, 2007.  (Defs. Exh. Y.)  Wimmer states he was retained by the Debtor in 2002 to attempt to obtain value from its restricted shares of E*Trade stock.  Wimmer attests to various difficulties he experienced in connection with his efforts, as well as the costs that other brokerage firms had proposed to charge the Debtor, and he states his fee "could have resulted in excess of $8 million," plus an additional fee for a broker.  The Wimmer Declaration supports the proposition that the Defendants contributed some value when they acted as an intermediary in connection with the STARS transaction.  Although nothing in the record

---

[33] Defendants state, citing Exh. N, that Amanat testified that 40 firms had refused to buy or assist in the transfer of the E*Trade shares.  (Def. Memo of Law, p. 40.)

[34] Plaintiffs' counterclaims in an E*Trade adversary proceeding brought against the Debtor seek damages from E*Trade on the ground, among others, that the Debtor suffered damages because of economic duress imposed by E*Trade, as well as E*Trade's failure to disclose that it never intended to pay the Earn Out. Counterclaims, ¶ 36-38, 53 in *E*Trade Financial Corp. v. MarketXT Holdings Corp.*, Adv. Pro. No. 05-1082 (ALG).  *See also* this Court's decision on the parties' cross-motions to dismiss, *E*Trade Financial Corp. v. MarketXT Holding Corp.*, 2006 WL 2864983 (Bankr. S.D.N.Y. Sept. 29, 2006).

supports a transaction fee higher than the proceeds accruing to the transferor ($15.5

million versus $12 million in connection with the STARS transaction), the issue of value

is factual and cannot be determined on this motion.[35]

Further proceedings are therefore required to determine what value, if any,

Defendants provided in connection with the closing of the STARS transaction.  In these

proceedings, under § 548(c), Defendants will have the burden of proof.  *See In re Candor

Diamond Corp.*, 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987); 5 *Collier on Bankruptcy* ¶

548.10 (15th ed. rev. 2007).  It accordingly must be emphasized that Defendants will

have to explain more effectively than they have to date their claim of right to all of the

proceeds of the STARS transaction not paid to creditors.  When they cite the Wimmer

Declaration, Defendants seem to support their claim as a transaction fee.  They did not,

however, charge $15.5 million as a transaction fee but as a prepayment penalty.[36]  That

raises the question whether a $15.5 million prepayment penalty in connection with the

STARS transaction is enforceable as a matter of law under the admitted facts of this case.

The Note was governed by the law of New York, and under its law, a court has a

duty to examine a prepayment penalty as a liquidated damages clause and to determine

whether it is reasonable or unenforceable as a penalty.  *See United Merchants and

Manufacturers, Inc. v. Equitable Life Assur. Soc.* (*In re United Merchants and Mfrs.*),

---

[35] Defendants have also submitted a declaration from Heather Tullar, a CPA and senior manager at the
Michel-Shaked Group, as an alleged expert on valuation and forensic accounting.  The Tullar declaration
does not state an opinion but rather a methodology for rendering an opinion on the value of the E*Trade
stock and the services contributed by Defendants.  Tullar states that she would be prepared to render an
opinion if she were paid for her services.  The declaration is based on several key assumptions; one is that
the shares were not registered and another is that the Pledged Shares were transferred to EIF "as though
Holdings had no residual claim in the remaining balance in the Pledge Collateral.  In other words, the
shares, once transferred, were no longer an asset of Holdings' and became an asset of Empyrean's".  (Decl.
¶ 6, 11)  Both of these assumptions are wrong, and the Tullar declaration does not contribute to a resolution
of the issues on this motion.

[36] The original note under the Pledge Agreement provided that EIF would lend the Debtor up to $17.5
million for one year and charge 8% interest for the "loan."  This would have provided EIF with a return and
perhaps be a valid indicator of an appropriate transaction fee.

674 F.2d 134, 143-44 (2d Cir. 1982) (Chapter XI case); *In re Vanderveer Estates*

*Holdings, Inc.*, 283 B.R. 122, 130 (Bankr. E.D.N.Y. 2002); *JMD Holding Corp. v.*

*Congress Fin. Corp.*, 4 N.Y.3d 373, 379, 795 N.Y.S.2d 502, 506, 828 N.E.2d 604, 609

(2005).  A liquidated damages clause is enforceable if it "specif[ies] a liquidated amount

which is reasonable in light of the anticipated probable harm, and actual damages must be

difficult to ascertain at the time the parties entered into the contract." *Wilmington Trust*

*Co. v. Aerovias de Mexico, S.A. de C.V.*, 893 F.Supp. 215, 218 (S.D.N.Y. 1995).  *See also*

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70 (2d Cir.

2004); *In re United Merchs. and Mfrs.*, 674 F.2d at 142; *Walter E. Heller & Co. v.*

*American Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972); *Truck Rent-A-Center v.*

*Puritan Farms 2nd*, 41 N.Y.2d 420, 425, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977).

The enforceability of a liquidated damages clause is a matter of law for the Court.  *See*,

*e.g.*, *Wilmington Trust Co. v. Aerovias de Mexico, S.A.*, 893 F.Supp. at 218 (S.D.N.Y.

1995), citing *Leasing Service Corp. v. Justice*, 673 F.2d 70, 74 (2d Cir. 1982); *In re*

*Ionosphere Clubs, Inc.*, 262 B.R. 604, 613 (Bankr. S.D.N.Y. 2001); *Bates Advertising*

*USA, Inc. v. 498 Seventh, LLC*, 7 N.Y.3d 115, 120, 818 N.Y.S.2d 161, 163, 850 N.E.2d

1137, 1139 (2006); *JMD Holding Corp. v. Congress Fin. Corp*, 4 N.Y.3d at 379, 795

N.Y.S.2d at 506, 828 N.E.2d at 609.[37]

     The Court can find as a matter of law that the prepayment penalty in the revised

Note is unenforceable in that it bore no reasonable relationship to any damages that could

have been suffered by Defendants from the action of the Debtor in prepaying a "loan"

---

[37] Prepayment provisions have been found to be valid and enforceable in bankruptcy cases but only if valid under applicable State law.  *See, e.g.*, *In re United Merchants and Mfrs.*, 674 F.2d at 140; *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 999 (9th Cir. BAP 1989); *In re Calpine Corp.*, 365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007).

made with its own funds.  Defendants allege that the high interest rate and the

prepayment penalty were agreed to by Amanat and Ashraf immediately after a phone call

with representatives of E*Trade in which Amanat was disparaged.[38]  Ashraf supposedly

sought higher compensation because he perceived a greater risk for the "loan."

Assuming for purposes of this motion for summary judgment that there is any truth to

this, Defendants never advanced any funds of their own except for $162,000 that was

reimbursed immediately upon the closing of the STARS transaction.  The only moneys

that Defendants agreed to "lend" were the Debtor's own property.  Defendants did not

risk their own property when they agreed to act as intermediary.

Moreover, even if a riskier loan might justify a higher interest rate, a prepayment

penalty is a liquidated damages clause designed to compensate a lender for costs incurred

in connection with early payment on a long-term loan, resulting from the possibility that

interest rates will be lower when the repaid funds are relent, or that the lender will not be

able to rely on a stable flow of funds over a known period.  *See U.S. v. Harris*, 246 F.3d

566, 573 (6th Cir. 2001), quoting *In re Ridgewood Apts. of DeKalb County*, 174 B.R.

712, 720-21 (Bankr. S.D. Ohio 1994); *see also Walter E. Heller & Co. v. Am. Flyers

Airline Corp.*, 459 F.2d at 899-900.  The possibility that the "loan" to the Debtor was

viewed as more risky does not provide any justification for extending its term from one

year to four years and imposing an enormous penalty on the Debtor for repaying it.

Examining the reasonableness of the revised provision in light of the circumstances at the

time of its creation, *In re United Merchants and Mfrs.*, 674 F.2d at 142, and giving

Defendants the benefit of every doubt, Defendants cannot justify a penalty that in effect

---

[38] Amanat was also listening in on the call and prompting Ashraf by email as to what he should say.  *See* 336 B.R. at 46.

charged the Debtor 76% of the principal amount of its own money if it repaid the putative

loan after one day.  This prepayment penalty was an unreasonable and unenforceable

liquidated damages clause.  *See*, *e.g.*, *Rye v. Public Service Mut. Ins. Co.*, 34 N.Y.2d 470,

472 358 N.Y.S.2d 391, 393, 315 N.E.2d 458, 459 (1974) (penalty imposed by city not

related to damages); *Pyramid Centres and Co. v. Kinney Shoe Corp.*, 244 A.D.2d 625,

628, 663 N.Y.S.2d 711, 713 (3d Dep't 1997) (double the fixed minimum rent

unreasonable liquidated damages in commercial lease); *Rochester v. E & L Piping, Inc.*,

196 Misc.2d 572, 576, 764 N.Y.S.2d 514, 518 (Sup. Ct. Monroe County 2003) (charging

125% of the contract for noncompliance with minority hiring standards unreasonable).

*Compare JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d at 376, 795 N.Y.S.2d at

504, 828 N.E.2d at 606 (enforcing a $600,000 prepayment penalty in connection with a

$40 million revolving loan as liquidated damages) *with Automotive Fin. Corp. v. Ridge

Chrysler Plymouth L.L.C.*, 219 F.Supp.2d 945 (N.D. Ill. 2002) (striking down a 15%

penalty for prepayment during first year of the loan as an arbitrary and unenforceable

penalty based on Illinois law); *see also*, *In re A.J. Lane & Co., Inc.*, 113 B.R. 821, 829

(Bankr. D. Mass 1990); *In re Kroh Bros. Dev. Co.*, 88 B.R. 997 (Bankr. W.D. Mo. 1988);

*In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1987).

  In conclusion, as to the STARS transaction, the record on Plaintiffs' motion for

summary judgment stands as follows.  Plaintiffs have established by clear and convincing

evidence that the transfer of $15.5 million to Defendants pursuant to the revised Note was

intentionally designed to hinder and delay the Debtor's creditors.  Plaintiffs have also

established as a matter of law that the prepayment penalty is unenforceable as such.

Plaintiffs are not entitled to summary judgment, however.  There is a genuine issue of

material fact as to whether Defendants acted in good faith and provided some value to the

Debtor in exchange for the transfer and, if so, the amount of the value provided.  Under

Bankruptcy Rule 7056, incorporating Fed.R.Civ.P. 56(d), the Court has a duty to specify

those material facts that are "actually and in good faith controverted" when resolving a

motion for summary judgment.  Defendants are entitled to a trial on the foregoing

controverted facts pursuant to Fed.R.Civ.P. 56(d).[39]

    (ii) *The Collar Transaction*

    The result is different with respect to the Collar transaction, which took place

about a month after the STARS transaction and netted the Debtor $13.2 million.

Defendants cannot claim that they contributed value by acting as middleman in

connection with that transaction, as B of A entered into the put/call arrangement directly

with the Debtor.  Amanat did not send the shares over to EIF for "cleaning," to use

Ashraf's word.  Nevertheless, Defendants rely on an extraordinary letter from Amanat to

Ashraf, supposedly dated May 2, 2003, in which T. Corp. (one of the names used for the

Debtor) agrees to deliver any proceeds received from the Collar transaction to Defendants

"and if retained by T-Corp. shall be an additional loan from Empyrean Investment Fund

L.P. [EIF] to T. Corp., Inc. under the same terms of the Pledge and Secured Note."  (*See*

Def. Exh. X.)  It is not clear when the parties created this document.  Even assuming it

was not another of the documents that Amanat and Ashraf backdated, it confirms that

Amanat and Ashraf were intentionally hindering and delaying, if not defrauding, the

Debtor's creditors by agreeing to the proposition that Defendants made "an additional

---

[39] Defendants may also seek to prove actual damages if Ashraf indeed became aware of additional risks as a result of the E*Trade phone call and Defendants suffered actual damage as a result.  *See Brecher v. Laikin*, 430 F.Supp 103, 106 (S.D.N.Y. 1977) ("If the [liquidated damages] clause is rejected as being a penalty, the recovery is limited to actual damages proven.").

loan" equal in amount to the proceeds of the Collar transaction and by purporting to make the Collar transaction subject to the onerous prepayment penalty in the Note.

There is no question on this record that the Debtor received no value from its agreement to deem the $13.2 million subject to the prepayment penalty. Defendants say very little in defense of the Collar transaction, asserting on pages 16-17 of their Memorandum of Law that EIF "arranged" the transaction. But they only support this proposition by pointing to their Exhibit X and contending that (i) "EIF subordinated its security interest in the remaining approximately 2,400,000 shares of the Non-Escrowed Stock and the Debtor received $14,200,000 from B of A" and (ii) "the Debtor consented to this transaction realizing that the transaction would provide it with greater flexibility by allowing the remaining, restricted shares of E*Trade to be used to obtain additional funds for the Debtor."

Both of these assertions are demonstrably wrong on the record before the Court. EIF did not subordinate its security interest to the interest of B of A. EIF never had an enforceable security interest in the shares sold in the Collar transaction. There is no evidence in the record that EIF ever took possession of the Debtor's shares or perfected a security interest in the shares or that these shares were ever registered in the name of any of the Defendants. In any event, when the shares were transferred to B of A on or about May 2, 2003, EIF lost whatever security interest it could claim. *See* the deposition testimony of Robert Dilworth of Bank of America, which Defendants have put in the record, at Defs. Exh. N, p. 116, lines 4-25.[40] The fact that EIF had lost any claim to a

---

[40] Dilworth also testified that Ashraf wanted to obtain a "subordinated security interest" below the "security interest" of B of A, and part of Defendants' Exhibit X consists of a proposed letter agreement between EIF and B of A, in which B of A agrees to "work in good faith with Empyrean Investment Fund, L.P. and Empyrean General Partner LLC to enter into intercreditor arrangements with respect to such subordinated

security interest is also confirmed by the letter (Def. Exh. X), described above, in which

the parties purported to deem the Collar proceeds an additional loan from EIF to the

Debtor.[41]

In addition to their reliance on the "subordination" of a "security interest" in the

shares that were subject to the Collar transaction, Defendants' Memorandum of Law also

has a second reason for asserting a right to the proceeds: "the Debtor consented to this

transaction realizing that the transaction would provide it with greater flexibility by

allowing the remaining, restricted shares of E*Trade to be used to obtain additional funds

for the Debtor." (p. 17.) Defendants do not even assert directly that the transaction

helped to achieve the Earn Out, but in any event, for the reasons stated above, providing

"flexibility" or even a chance at the Earn Out does not represent value and justify

Defendants' claim to the $13.2 million.

Moreover, § 548(c) and comparable State fraudulent conveyance law requires that

value be given directly "in exchange" for the transfer of the property in question. *See In

re Johnson*, 357 B.R. 136, 140 (Bankr. N.D. Cal. 2006); *see also In re Advanced

Telecomm. Network*, *Inc.*, 490 F.3d 1325, 1337 (11th Cir. 2007) (construing similar

---

security interest in the Subject Shares on mutually satisfactory terms." No evidence of any such
intercreditor arrangement has been produced, the document attached as part of Defendants' Exhibit X is not
signed by B of A, and Dilworth did not recall that any such agreement had ever been reached (Exh. N, p.
132, line 23 to p. 125, line 2.). In any event, the proposition that B of A would give EIF a subordinated
security interest is wholly inconsistent with the Bank's intention to dispose of the Debtor's E*Trade stock.
[41] This letter also had a provision that purported to give Defendants a continuing security interest in the
shares through the fiction that the Debtor, the "borrower," would act as collateral agent for EIF as lender.
A borrower cannot act as collateral agent for its own lender and thereby grant a valid security interest in a
debt. *See, e.g.*, *Clarkson Co. Ltd. v. Shaheen*, 533 F.Supp. 905, 918 (S.D.N.Y. 1982) (refusing to recognize
a perfected security interest when the debtor delivered stock to an escrowee but debtor still retained control
and dominion over the pledged securities); U.C.C. § 9-313, Official Comment 3:

> [U]nder appropriate circumstances, a court may determine that a person in possession is
> so closely connected to or controlled by the debtor that the debtor has retained effective
> possession, even though the person may have agreed to take possession on behalf of the
> secured party. If so, the person's taking possession would not constitute the secured
> party's taking possession and would not be sufficient for perfection.

language in of New Jersey law).  As was recently emphasized in *In re Bayou Group*, *LLC*, 362 B.R. at 638, "The Court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of either an intentional or constructive conveyance."  Focus on the specific transfer to be avoided confirms that the Debtor received nothing "in exchange" for its gratuitous agreement to subject the proceeds of the Collar transaction to the prepayment penalty in the Note.

Moreover, there is additional evidence in the record that supports the conclusion that Defendants did not provide any value in good faith in connection with the "prepayment" of the Note.  There is a one-line letter dated August 25, 2003, in which Ashraf purports to confirm "receipt of $13,214,691 from T Corp Inc. [the Debtor] today as repayment of funds lent from Empyrean Investment Fund L.P. to T Corp Inc. on May 6, 2003."  However, Ashraf has admitted that this letter was backdated, and might not have been created until 2005.  (Plaintiffs' Exh. 112.)  The notion of a prepayment in August 2003 is inconsistent with the fact that the funds were still EIT's property in August 2003, and they appear to have remained in EIT's name until April 2004. Moreover, in August 2003 or some time thereafter, the parties also created another "agreement," dated August 22, 2003, and entitled "Prepayment of Loan," in which Amanat and Ashraf purported to vacate an earlier repayment of the "loan," to confirm all of T Corp.'s obligations under the Pledge Agreement and Note, and to "release any and all claims" T Corp. might have against EIF under the earlier repayment letter. (Defendants' Exh. S.)  These documents only provide further evidence of an absence of good faith and value.

In conclusion, Plaintiffs are entitled to summary judgment on their claim for the $13.2 million in net proceeds of the Collar transaction on the counts of the Complaint based on intentional fraudulent conveyance.

III. *Plaintiffs' Other Claims*

Plaintiffs' motion seeks judgment on several of their other claims, although they are briefly argued.  They are as follows:

A. *Constructive Fraud*

Plaintiffs seek judgment on the Fifth Count of the Complaint on the ground that the transfers at issue were constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code on the ground that the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and …

> (II) was engaged in business or a transaction … for which any property remaining with the debtor was an unreasonably small capital; or
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[42]

The Plaintiffs do not rely on § 548(a)(1)(B)(I), providing for avoidance of a constructive fraudulent conveyance where the debtor was insolvent or rendered insolvent by the transfer, presumably because solvency would raise an issue of fact on this motion.[43]

A cause of action based on constructive fraud relieves a plaintiff from the requirement of proving intent to "hinder, delay or defraud creditors" but requires proof

---

[42] The provisions of the New York DCL that are analogous to these subsections of the Federal Bankruptcy Code are §§ 274 and 275.  Plaintiffs state that the Complaint "inadvertently" omits reliance on these sections and cites authority that a Court can deem a complaint amended at any time, even during the pendency of a motion for summary judgment.  *See In re Bennett Funding Group, Inc.*, 220 B.R. at 752; *Moreno v. Schwartz* (*In re Schwartz*), 36 B.R. 355, 357 (Bankr. E.D.N.Y. 1984).  Defendants do not take issue with this as a procedural matter, and there is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance.  Under these circumstances, the Complaint will be deemed amended to include claims under State law that are analogous to the claims of constructive fraud in the Complaint.

[43] Defendants have insisted throughout these proceedings that the Debtor was solvent at all times because of the value of its claims against Softbank and E*Trade.

that the debtor received less than a "reasonably equivalent value."[44]  Defendants do not

assert that Plaintiffs could not establish, for purposes of summary judgment, that the

Debtor was, after the STARS and Collar transactions, left with an "unreasonably small

capital" or unable to pay its debts as such debts matured.  11 U.S.C. § 548(a)(1)(B)(II)

and (III).  Defendants contend that a question of fact is raised with respect to the issue of

"reasonably equivalent value" and that this precludes summary judgment for Plaintiffs.

With respect to the Collar transaction, the Court has already found that the Debtor

did not receive any value in exchange for its agreement to subject $13.2 million to the

onerous terms of the Note, including the prepayment penalty.  Since no "value" was

received, the Debtor could not have received "reasonably equivalent value."  The Court

can find as a matter of law that the Debtor did not receive "reasonably equivalent value"

or a "fair equivalent" for the funds transferred to Defendants in connection with the

Collar transaction.  *See R.M.L*, 92 F.3d at 147-48; *Geron v. Palladin Overseas Fund*, *Ltd.*

(*In re AppliedTheory Corp.*), 330 B.R. 362, 364 (S.D.N.Y. 2005).

The $15.5 million that Defendants claim in connection with the STARS

transaction is different.  Defendants argue that their services as intermediary were a

"reasonable equivalent" of this amount.  They have not provided credible support for the

proposition that their services were worth $15.5 million, and the prepayment penalty has

been found to be unenforceable for the reasons stated above, but the Court has also

determined that a question of fact has been raised as to whether Defendants provided

"value" to the Debtor in connection with the STARS transaction.  "Whether a transfer is

for reasonably equivalent value is largely a question of fact, the determination of which

---

[44] Under State law, the concept of reasonably equivalent value is embedded in the requirement that the transferor receive "fair consideration."  *Geron v. Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 323 B.R. 838, 840 (Bankr. S.D.N.Y. 2005) ("Courts typically use these terms interchangeably.").

perforce depends on all the circumstances surrounding the circumstances." *American Tissue Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F.Supp.2d 79, 105 (S.D.N.Y. 2004), citing *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 466 (S.D.N.Y. 2001); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 308 (S.D.N.Y. 2001), citing *HBE Leasing Corp. I*, 48 F.3d at 638; *see also In re Sharp Int'l Corp.*, 403 F.3d at 53 (New York law).  Giving Defendants the benefit of every reasonable inference, the Court will not grant Plaintiffs' motion for summary judgment insofar as it is based on the premise that the transfer to Defendants in connection with the STARS transaction was a constructive fraudulent conveyance.  A trial will be necessary on the issue of "reasonably equivalent value," as well as on Defendants' defense under § 548(c) of the Bankruptcy Code and analogous State law that they provided "value" by acting as a middleman in connection with the STARS transaction.

In sum, on the instant record for summary judgment, Plaintiffs have not established that a reasonable fact-finder could not determine that Defendants' actions as intermediary in the STARS transaction conveyed some value to the Debtor.  The Court cannot determine, on the record on this matter, what a reasonable fact-finder would determine to be reasonably equivalent value for the services performed.  Accordingly, Plaintiffs are not entitled to summary judgment on their constructive fraud claims regarding the transfers in connection with the STARS transaction.  Plaintiffs are entitled to summary judgment on their constructive fraud claims regarding the Collar transaction, as Defendants provided no value to the Debtor in exchange for the transfer of $13.2 million.

*B. Conversion, Unjust Enrichment, Constructive Trust*

Plaintiffs also seek summary judgment on the counts of the Complaint that allege

conversion (16th), unjust enrichment (14th) and constructive trust (15th).

Under New York law the elements of conversion are that "(1) the party charged

has acted without authorization, and (2) exercised dominion or a right of ownership over

property belonging to another, (3) the rightful owner makes a demand of the property,

and (4) the demand for the return is refused."  *Fagan v. First Sec. Invs., Inc.*, 2006 U.S.

Dist. Lexis 66065 at *10 (S.D.N.Y. Sept. 15, 2006); *see also Seanto Exports v. United

Arab Agencies*, 137 F.Supp.2d 4445, 451 (S.D.N.Y. 2001); *Comm. of Unsecured

Creditors v. American Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 465 (Bankr.

S.D.N.Y. 2006).  Plaintiffs' conversion claim fails on the ground that Plaintiffs have not

established that the transfers they challenge were unauthorized.  Indeed, their Complaint

relies principally on the allegation that Amanat and Ashraf worked together to engineer

intentional fraudulent conveyances, and the record supports this finding.  *See also* this

Court's decision in the *Epoch* case, finding that a conversion claim could not be sustained

because Amanat had agreed to the challenged transactions.  2007 WL 680763 at *5.

It might be possible for Plaintiffs to establish that Defendants converted funds in

which the Debtor claimed an ownership interest when Defendants refused to return those

funds after the bankruptcy was filed.  For example, the record establishes that Defendants

did not establish complete control over the proceeds of the Collar transaction until 2004.

Nevertheless, Plaintiffs have proceeded on the theory that Defendants took control over

the Collar proceeds in 2003, when they were supposedly applied as an alleged

prepayment penalty.  *See* SOF 101.  There is no evidence that this step was taken without

Amanat's consent, express or implied.  Moreover, Plaintiffs have proceeded on the theory

that all of the transfers can be set aside or recovered.  They have not limited their claims

to those funds that Defendants have retained with no apparent claim of right—for

example, the difference between the cost of the prepayment penalty (said to be $22

million) and the total $28.7 million transferred to Defendants ($15.5 million in

connection with the STARS transaction and $13.2 million in connection with the Collar

transaction).  Based on Plaintiffs' pleadings, they are not entitled to summary judgment

on their claim for conversion.

Similarly, Plaintiffs have not on this record justified an order of summary

judgment on their claims of unjust enrichment or constructive trust.  Unjust enrichment is

a remedy that the law creates "in the absence of any agreement."  *Beth Israel Med.*

*Center v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 579 (2d Cir. 2006).

Here, there were express agreements that the Plaintiffs are attempting to avoid.  A

constructive trust is an equitable remedy, appropriate "[w]hen property has been acquired

in such circumstances that the holder of the legal title may not in good conscience retain

the beneficial interest [so] equity converts him into a trustee."  *Beatty v. Guggenheim*

*Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919).  The creation of a constructive

trust would be subject to the same defenses as Plaintiffs' claim for fraudulent conveyance

and could not be established as a matter of law on the record here in respect of the

STARS transaction based on the issues that Defendants have raised in their affirmative

defense.

IV. *Defendants' Additional Claims*

Defendants also raise two miscellaneous defenses. Defendants first claim that the

STARS and Collar transactions were "swaps" and thus immune from challenge under §

546(g) of the Bankruptcy Code.[45]  First, § 546(g) does not apply in the case of intentional

fraudulent conveyances under § 548(a)(1)(A).  Second, a swap has been described as

> a bilateral agreement, frequently between a commercial entity involved
> with commodities or subject to interest rate, currency or equity price
> fluctuations and a financial intermediary, whereby cash payments are
> exchanged periodically (or a lump sum at termination) between the parties
> based upon changes in the price of the underlying asset or index as
> determined by an agreed-upon benchmark.

 J. Francis, W. Toy and J. Whittaker, *The Handbook of Equity Derivatives* 527 (1995),

quoted in *Interbulk Ltd. v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195, 201

(Bankr. S.D.N.Y. 1999).  The transactions between the Debtor and EIF that gave rise to

the transfers that the Plaintiffs are attempting to avoid, such as those under the Note, were

not swaps.

Defendants have also interposed a belated claim in their Supplemental

Memorandum that the Court does not have jurisdiction under the "*Wagoner* rule" because

this action seeks recovery on causes of action that belong to creditors.  *See Shearson*

*Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).  Defendants ignore

the fact that avoidance actions do not fall within the *Wagoner* rule.  *See Pickard v. Taylor*

(*In re Park South Securities, LLC*), 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005); *Tese-*

*Milner v. Beller* (*In re Hampton Hotel Investors, L.P.*), 289 B.R. 569, 580 (Bankr.

S.D.N.Y. 2003); *In re Verestar, Inc.*, 343 B.R. at 480, n. 19.  Moreover, the claims

asserted in the Complaint that do not seek avoidance relief are all actions solely by and

---

[45] Section 546(g) is applicable to this 2004 case in its form prior to the 2005 Amendments to the
Bankruptcy Code.

on behalf of the Debtor (*e.g.*, for conversion of its property or for unjust enrichment at its
expense).

Defendants' additional defenses have no merit.

V. *Defendants' Motion to Access the Restrained Funds*

While Plaintiffs' motion for summary judgment was *sub judice*, Defendants also
filed a motion of their own. Asserting that their current counsel, Denner Pellegrino, LLP
("Denner"), has not been paid any fees or reimbursed its expenses since its initial retainer
expired in March 2006, they moved to invade the remaining funds held in escrow in order
to be able to pay Denner's current bill, in excess of $1 million, including amounts due
other "firms, vendors, and service providers for litigation related work."

This is Defendants' second motion to access the remaining restrained funds. On
December 2, 2005, while the contempt motion was *sub judice*, Defendants moved for the
release of $250,000 of the restrained funds, purportedly to pay professional fees and
$100,000 for a "management fee." That motion was denied without prejudice. The
Court in its January 2006 Opinion concluded that "Ashraf has to explain how the
Defendants are going to restore the $6.7 million paid over to Bhatti before he can
contemplate any further depletion of the restrained funds or any trading of the remaining
funds." 336 B.R. at 66.

Defendants have now renewed their motion to access the funds, seeking to use up
to $1.5 million. Purporting to rely on the Court's earlier rulings, Defendants argue that
they have cooperated with all of their discovery obligations, that there is no other source
of moneys which they can tap for legal fees, and that they should therefore be able to
utilize part of the restrained funds at this time for legal fees. Defendants also contend

that pursuant to Bankruptcy Rule 9024, incorporating Fed.R.Civ.P. 60(b)(5) and (b)(6),

and Bankruptcy Rule 7065, incorporating Fed.R.Civ.P. 65(b), they are entitled to

equitable relief against prospective application of the judgment freezing the restrained

funds.  Furthermore, Defendants argue, without legal citation, that refusal to permit them

to utilize frozen funds to mount their defense would violate their "constitutional right to a

full and fair trial."  None of these contentions provides a basis for Defendants to invade

the funds for their benefit.

Defendants first argue that they will be impeded in their ability to defend

themselves if they are unable to access a portion of the restrained funds for legal fees and

expenses.  Since the motion to invade funds was not submitted before the summary

judgment motion was fully briefed and submitted for decision, it certainly did not prevent

Defendants from submitting thousands of pages of argument and material in opposition to

the Motion.

Moreover, all of the funds that Defendants seek to access are the proceeds of the

same transactions that the Trustee seeks to avoid in this adversary proceeding.  Courts

have denied defendants in civil actions use of funds that are traceable to their own

wrongdoing.  In *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993), the District Court

issued a preliminary injunction blocking defendant Quinn from accessing funds he had

allegedly realized through securities fraud, even to finance his defense.  Although the

District Court had released small amounts of the frozen money for Quinn's legal bills,

Quinn proceeded to send the released money overseas, leading the Court to impose a

complete freeze of his assets.  In language that has been quoted in other cases, the Circuit

Court noted that "[a] swindler in securities markets cannot use the victims' assets to hire

counsel who will help him retain the gleaning of his crime." There is thus ample authority for imposing a freeze where there are grounds to enter a preliminary injunction. *See also S.E.C. v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) (granting the SEC's motion to freeze funds prior to trial on the underlying charges of fraud, and denying the defendant access to the funds for his legal expenses).

A defendant's illicitly obtained assets can be frozen at the expense of his ability to mount a defense even in a criminal case. In *United States v. Monsanto*, 491 U.S. 600, 602-04 (1989), the Supreme Court upheld a District Court order that froze the defendant's assets prior to trial. The Court held that such a freeze does not violate a defendant's constitutional rights even though it precludes the use of the money for attorneys' fees so long as the freeze is based on "a finding of probable cause that the assets are forfeitable." *Id.* at 615. The escrow that Defendants seek to invade consists of assets that have been held, first, on Defendants' consent pending a preliminary injunction hearing; and second, as security for Defendants' contempt in having depleted the escrowed funds. They can now also be held as proceeds of avoided transfers that are larger than the amount of the restrained funds.

Defendants cite no legal right to access the restrained funds, except to assert a general deprivation of "constitutional rights." The fact is that the courts have generally not recognized a Constitutional right to counsel unless a party's physical liberty is jeopardized. *See Lassiter v. Dep't of Social Services*, 452 U.S. 18, 26-27 (1981); *MacCuish v. United States of America*, 844 F.2d 733, 735 (10th Cir. 1988); *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir. 1980); *Wolfolk v. Rivera*, 729 F.2d 1114, 1120 (7th Cir. 1984). Moreover, Defendants misconstrue *Grupo Mexicano de Desarrollo, S.A. v.*

*Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999), as support for the proposition that

"before judgment (or its equivalent) an unsecured creditor has no rights at law or in

equity in the property of his debtor," and that the Court therefore lacks authority to

continue to freeze the restrained funds.  The principles of the *Grupo Mexicano* case do

"not bar courts from freezing assets to preserve them for equitable relief, such as

disgorgement." *SEC v. Lauer,* 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006), citing *SEC v.

ETS Payphones, Inc.*, 408 F.3d 727, 734-35 (11th Cir. 2005).  Since the restrained funds

were initially frozen (on consent) to preserve them for valid equitable relief, *Grupo

Mexicano* does not govern.

        Defendants next argue that the grounds that led to the restraint of the funds in

2005 have changed and that the restraint should be modified as a consequence thereof.

The circumstances have changed, but against Defendants.  The funds are now held in

respect of one judgment, to protect Plaintiffs against the consequences of Defendants'

contempt, and one prospective judgment to which Plaintiffs have been found entitled in

the foregoing decision.  *See Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*, 74 F.R.D.

621, 623 (D.C.N.Y. 1977); *Centennial Broad. v. Burns*, 433 F.Supp.2d 730, 733 (W.D.

Va. 2006).  Even without considering the summary judgment case, Plaintiffs have a

strong interest in holding the remaining $5.6 million as security for Defendants'

contempt.  Defendants argue in their papers that they have done much to cure their

contempt, but they have not restored any of the missing funds.  Defendants cite as a

principal step they have taken to cure the contempt the commencement by Defendants of

the lawsuit against Bhatti in Massachusetts and the entry of a default judgment there.

Since Bhatti had already absconded from his home in Canada, with the millions that

Defendants had put in his possession, and was known to have gone to the Middle East or Europe, a judgment in Massachusetts, which is Defendants' home base, is hardly a major step forward.

Defendants contend that they have made full disclosure of their finances and have established that they do not have the funds to restore the $6.75 million that they have diverted. On the contrary, the Trustee has provided ample detail of his lengthy effort to obtain information on the Defendants' ability to satisfy the contempt judgment against them and of Defendants' stonewalling tactics. The chart that Defendants have submitted does not demonstrate good faith compliance with the Trustee's discovery demands and does not address the myriad questions that exist regarding Ashraf's sources and uses of funds. As one example, the Trustee was able to trace Ashraf's February 2005 transfer of funds totaling $2 million from a bank account he controlled to a lawyer in California named Abdullah. When Abdullah was subpoenaed, he revealed that on or about March 15, 2005, only a few days before this adversary proceeding was brought and after the Trustee had examined Ashraf pursuant to Bankruptcy Rule 2004, Ashraf directed the transfer of $1.5 million to Ashraf's brother in Dubai to fund a personal investment in a Dubai-based company called Mobility FZ LLC ("Mobility"). Although the Mobility shares were eventually escrowed, they are one example of large amounts of money that have gone in and out of Defendants' hands without adequate explanation.

Defendant Ashraf contends that the notoriety of the instant litigation and the availability of information on the internet has precluded him from obtaining new clients as a hedge fund manager and of having the same earning capacity as prior to the litigation. Even if Ashraf ever had any substantial clients who were not referred by

Amanat, the Trustee is not responsible for Ashraf's contempt in diverting millions of dollars of funds to a Canadian resident, who absconded with them.

The initial order freezing the restrained funds was entered to maintain the "status quo" and to prevent the depletion of what then became the restrained funds. This was the appropriate result at the time, as maintaining the "status quo" is a principal purpose of a preliminary injunction. *See Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966). The relevance, applicability, and need for an injunction are even greater today than when the preliminary injunction was initially entered.

CONCLUSION

Plaintiffs are entitled to summary judgment on their claims to avoid the transfers to Defendants in connection with the Collar transaction and to recover those funds for the estate. Since Plaintiffs have sustained their cause of action for intentional fraudulent conveyance under State as well as Federal law, they appear entitled to reasonable attorneys' fees under § 276-a of the New York DCL, which awards attorneys' fees to the plaintiff in a case charging intentional fraudulent conveyance. There is also authority that a plaintiff in a fraudulent conveyance case is entitled to interest. Plaintiffs may settle a judgment on 20-days' notice avoiding the Collar transfers and providing for interest and attorneys' fees; if attorneys' fees or interest are sought, they should be supported in detail. The Court will hold a hearing on the issue of interest and attorneys' fees if Defendants request one.

Plaintiffs are also entitled to an order pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56(d) finding that they have proved by clear and convincing evidence that the transfer of $15.5 million to Defendants in connection with the STARS transaction

was an intentional fraudulent conveyance, and that the prepayment penalty is unenforceable as such under applicable law.  However, Defendants are entitled to a trial on their defense that they gave value in good faith to the Debtor by acting as intermediary in connection with the STARS transaction and on their claim (if they pursue it) that they suffered actual, compensable damages as a consequence of the "early payment" of the debt.  Plaintiffs are not entitled to summary judgment on their claims of constructive fraud in connection with the STARS transaction, or on Counts 14, 15, and 16 of the Complaint.  Plaintiffs should also settle a form of order with respect to this branch of the motion on 20-days' notice, specifying the material facts to be tried under Rule 56(d) and setting the matter down for a conference.

Plaintiffs finally should settle an order providing for denial of the motion to invade the restrained funds.


Dated: New York, New York
       October 12, 2007

                              /s/ Allan L. Gropper
                              UNITED STATES BANKRUPTCY JUDGE