UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              :
                                                    :           Chapter 11
MARKETXT HOLDINGS CORPORATION,                      :
*et al.*                                            :           Case No. 04-12078(ALG)
                                                    :
                             Reorganized Debtors.   :
------------------------------------------------------------x
ALAN NISSELSON, as Chapter 11                       :
Trustee of MarketXT Holdings Corporation, and       :
the Official Committee of Unsecured Creditors,      :
                                                    :
                             Plaintiffs,            :
            v.                                      :
                                                    :
EMPYREAN INVESTMENT FUND, L.P.,                     :           Adv. No. 05-01268 (ALG)
EMPYREAN GENERAL PARTNER, LLC,                      :
ASH MASTER FUND, II, LLC, ASH MASTER                :
FUND II, L.P., ASH FUND LP, f/k/a EMPYREAN          :
FUND, LP, ASH FUND II LP, ASH CAPITAL,              :
LLC f/k/a, ASH CAPITAL MANAGEMENT,                  :
ASH GENERAL PARTNER, LLC, ASH                       :
OFFSHORE FUND, LTD., ASH GENERAL                    :
PARTNER OFFSHORE, LTD., RAUF ASHRAF,                :
AND JOHN DOES 1 THROUGH 10,                         :
                                                    :
                             Defendants.            :
------------------------------------------------------------x

## MEMORANDUM OF OPINION

APPEARANCES

KAYE SCHOLER LLP
Attorneys for Plaintiffs
425 Park Avenue
New York, New York 10022
 By:   Lester Kirshenbaum
       Margarita Y. Ginzburg
       Dina S. Rovner

-and-

1

WINDELS MARX LANE & MITTENDORF, LLP
Attorneys for Plaintiffs
156 West 56th Street
New York, New York 10019
  By:   Howard L. Simon

DENNER PELLEGRINO, LLP
Attorneys for Defendant Empyrean Investment Fund, L.P.
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
  By:   Jeffrey A. Denner
        Roger D. Matthews

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

In a Memorandum of Opinion dated October 12, 2007, 376 B.R. 390 (Bankr. S.D.N.Y. 2007), the Court decided the motion for summary judgment filed by the above-captioned plaintiffs, the Chapter 11 trustee and creditors committee ("Plaintiffs") in the bankruptcy proceedings of MarketXT Holdings Corp. ("Debtor").[1]  Familiarity with that decision is assumed.  In brief, Plaintiffs challenged, as fraudulent conveyances, two related transactions that in effect conveyed to Defendant Empyrean Investment Fund, L.P. ("EIF") and its affiliates and principal, Rauf Ashraf ("Ashraf"), the entirety of the proceeds of certain stock of E*Trade Corporation ("E*Trade") that the Debtor had received in connection with its sale to E*Trade of its principal subsidiary.  The first conveyance from the Debtor to EIF took place in connection with EIF's transfer of the shares to Bank of America ("BofA") in the so-called STARS transaction, generating $27.4 million in funds.[2]  In a second transaction about a month later, the so-called Collar

---

[1] The Debtor was also known as T Corp. and Tradescape.  Since the summary judgment decision was rendered, a plan of reorganization has been confirmed for the Debtor and several affiliates, including Epoch Investments, L.P. ("Epoch").  The Debtor's former Chapter 11 trustee is now the Responsible Officer, and he and the former creditors committee (now the Plan Committee) are authorized to prosecute claims and causes of action on behalf of the estate, including the claims being pursued herein.
[2] STARS is an acronym for specialized term appreciation retention sale.

2

transaction, the Debtor sold its remaining E*Trade stock directly to BofA, but thereafter transferred most of the proceeds, $14.6 million, to EIF.

In its 2007 decision, the Court held that Plaintiffs had established that the transfer of the proceeds of the Collar transaction was avoidable on both intentional and constructive fraudulent conveyance grounds, and summary judgment was entered against all of the defendants, jointly and severally, in the amount of $13,214,691 (the "Decision"). Judgment was entered on November 9, 2007.[3] With respect to the STARS transaction, the Court held that the Plaintiffs had established a *prima facie* case that the transfers were avoidable as intentional fraudulent conveyances, but that Defendants were entitled to a trial to establish their affirmative defense under § 548(c) of the Bankruptcy Code and analogous State law that they "gave value to the debtor in exchange for such transfer or obligation" and that they acted "in good faith."[4] With respect to Plaintiffs' claim that the transfers in connection with the STARS transaction constituted a constructive fraudulent conveyance, under § 548(a)(1)(B) of the Bankruptcy Code and New York DCL § 273, the Court held that Defendants were entitled to a trial on the issue whether they had contributed "reasonably equivalent value" (§ 548) or "fair consideration" (DCL §§ 272, 273) to the Debtor in exchange for the value transferred.[5]

---

[3] The judgment was for the proceeds of the Collar transaction, plus interest, net of amounts paid to or for the benefit of the Debtor and a BofA fee of $400,000. Defendants lodged a notice of appeal, dated November 16, 2007, from the judgment; the appeal was dismissed by the District Court on August 20, 2008 for failure to prosecute (Hon. Richard M. Berman). The summary judgment decision also invalidated a prepayment penalty that was found to be unenforceable as a matter of law. The decision gave Defendants an opportunity to argue that they suffered actual, compensable damages as a consequence of the "early payment" of the debt. No effort was made by the Plaintiffs to make this showing, and the issue is deemed abandoned.

[4] The quoted language is from § 548 of the Bankruptcy Code. There is no dispute that the analogous State law provision, made applicable by § 544(b) of the Bankruptcy Code, is § 276 of the New York Debtor and Creditor Law ("DCL").

[5] Defendants have the burden of proof on this issue under the Bankruptcy Code, but New York State law generally places the burden on the plaintiff to demonstrate lack of "fair consideration," at least where the

3

On November 2, 2009, the Court held a trial on the open issues relating to the STARS transaction. The sole defendant was EIF, the principal in the STARS transaction, and the only defendant that had waived its right to a jury trial in its agreement with the Debtor. Plaintiffs had elected to proceed against this defendant alone on a non-jury basis.[6] The parties compiled a very extensive record, incorporating, among other things, testimony taken at several prior hearings. Two witnesses testified at the trial on November 2nd, including Rauf Ashraf, EIF's principal. Thereafter, extensive and detailed post-trial findings of fact and conclusions of law were submitted by both parties.

Based on the entire record, the Court makes the following findings of fact and conclusions of law with respect to the open issues only against Defendant EIF.[7]

Value

In connection with the Plaintiffs' claims of intentional fraudulent conveyance, the Decision provided Defendant EIF with the opportunity for a trial on the question whether it had provided value to the debtor in good faith within the meaning of § 548(c) of the Bankruptcy Code and § 276 of the New York DCL. In connection with the claims of constructive fraudulent conveyance, the Court also left open the question whether Defendants had provided "reasonably equivalent value" to the Debtor. Under § 548(a)(1)(B) of the Bankruptcy Code, a conveyance may be found to be constructively

---

transferee is not a family member. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003); *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 660 n.15 (Bankr. E.D.N.Y. 2008).

[6] By order dated November 20, 2007, the Court clarified the issues for trial and directed that a hearing be held on Defendants' demand for a jury trial. At a hearing on December 18, 2007, it was determined that Plaintiffs would proceed on a non-jury basis against Defendant EIF, and that EIF had waived its right to a trial by jury in its agreement with the Debtor.

[7] Although these findings are entered only against EIF, it is worth noting that EIF does not argue that judgment should not be entered against it because, for example, one of the other original defendants (not EIF) was the recipient of the proceeds of the STARS transaction. EIF contracted with MarketXT for the transfers at issue, and it is patent that the challenged transfers in connection with the STARS transaction were made to or for its benefit within the meaning of § 550(a)(1) of the Bankruptcy Code.

fraudulent if, among other things, the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation"; under § 273 of the New York Debtor and Creditor Law, the very similar issue is whether the transfer is supported by "fair consideration."[8]

EIF's principal contention on the summary judgment motion was that it had provided value or reasonably equivalent value because it intended to use the proceeds of the STARS transaction to provide trades to E*Trade and thereby increase the Earn Out, a provision in the Debtor's agreement with E*Trade that gave the Debtor additional consideration if the subsidiary that E*Trade had bought reached certain sales targets. EIF's contentions with respect to the Earn Out were rejected in the summary judgment decision, the Court finding that the Debtor could not "have had a 'legitimate and reasonable' expectation of benefit from a transaction that transferred all of its non-contingent assets to Defendants in return for a vague, speculative promise, never performed, to let the Debtor have the use of some of the funds to trade in securities." 376 B.R. at 413.

EIF in its post-trial papers has continued to rely on the Earn Out as evidence of value, as well as its good faith. (Proposed Findings of Fact 24-26). However, nothing in the record of the trial indicates that EIF's alleged oral agreement to use the BofA proceeds to trade in such a manner as to trigger the Earn Out was anything other than a vague and speculative promise, never performed in any respect.[9] By the time of the

---

[8] It was never contested that the Debtor, the transferor, was at the time of each conveyance insolvent, with unreasonably small capital, or unable to pay its debts as they matured. *See* 11 U.S.C. § 548(a)(1)(B)(i)-(iii); DCL §§ 271(1), 273-274.

[9] For example, at the trial of this matter, Ashraf was asked whether he had "any arrangement with any party whereby you would be compensated for, if you will, assembling a consortium of funds to provide trades for E*Trade?" His answer: "Yes. I mean that was my stake in the earn out and, you know, again from '02, those Hale and Dorr documents, and the stuff that's in the record." Tr. 81, 1. 3-8. The Court is unaware of

5

STARS transaction, most of the Earn Out period had already expired, and if there ever was a promise to use the STARS proceeds for the Debtor's benefit, EIF repudiated it. EIF never used the STARS proceeds in a manner that would increase the Earn Out, or in any other manner that provided a benefit to the Debtor. In fact, the only payments from the STARS proceeds that ever benefited the Debtor or the Debtor's creditors were those payments that were made directly or indirectly to creditors who held liens on the shares, including $11.6 million paid to Softbank in partial compliance with the Softbank Payoff Agreement, described below, and $162,000 paid to EIF to reimburse it for having obtained the release of a lien held by another creditor.[10] EIF retained the balance of the proceeds of approximately $15.5 million, as well as the proceeds of the Collar transaction, and it has resisted and continues to resist restoring any of these proceeds.[11]

EIF first contends that it provided value because it was instrumental in removing restrictions that had earlier made it impossible or impractical for the Debtor to dispose of the E*Trade stock. There were two relevant restrictions. First, the Debtor's transaction with E*Trade provided that the shares could be registered and sold only in tranches and only over time. However, the record demonstrates that the shares transferred in the STARS transaction had already been registered in the Debtor's name on or about

---

anything in the record, or in the documents prepared by EIF's counsel, Hale & Dorr, that provides support for Ashraf's assertions regarding the Earn Out. When Ashraf was asked whether there was anything else that the Court should be aware of, he said: "Well, I mean I think there's a lot of evidence clearly of the firms that I assembled. My own trading, you know, lifting restrictions as I testified, and I don't at this point know what else to add." Tr. 81, 1. 18-24.

[10] Plaintiffs have not sought to recover this $162,000 payment. This was the only thing of value that EIF ever contributed to or for the benefit of the Debtor, and EIF was reimbursed for this advance a few days after it was made. Tr. 115, 1. 24-25, 116, 1. 1-6.

[11] In 2005, when the Debtor's estate brought the instant proceeding against EIF and the other defendants to avoid the transfers as fraudulent conveyances and obtained an order directing that the remaining proceeds of the STARS and Collar transactions be placed in escrow, Ashraf, acting on behalf of the defendants, transferred most of the remaining proceeds outside the country, resulting in a judgment of contempt against all of the defendants, including EIF, in the amount of $ 6.7 million. *See* 376 B.R. 39 (Bankr. S.D.N.Y. 2006).

6

November 27, 2002, before EIF's involvement. Any further restrictions, such as a requirement that the shares be sold in a private transaction, were not material and did not impact a transaction with an institutional investor such as BofA.

The second restriction was that the shares were subject to a lock-up agreement for the benefit of Softbank Finance Corp. ("Softbank"), the Debtor's largest creditor, which had entered into certain agreements with the Debtor providing for a pledge of the shares and application of the proceeds of the E*Trade stock to repay its debt. In January 2003, Softbank and the Debtor had agreed, in the so-called Softbank Payoff Agreement, to the release of 7,000,000 of the E*Trade shares so that they could be pledged or hypothecated to a lender against a loan to obtain proceeds to pay creditors (particularly Softbank). Detailed provisions were agreed as to the distribution of the proceeds, depending in part on the current market price of the E*Trade shares, with the Debtor committing itself to the application of proceeds in excess of a certain recovery so as to provide Softbank with $16/17^{ths}$ of the balance until the Softbank debt was paid in full.

There is nothing in the record to indicate that EIF provided value in good faith in connection with the release of the shares from the Softbank lock-up, assuming *arguendo* that Softbank needed an incentive in addition to its receipt of most of the proceeds.[12] On the contrary, the record establishes that EIF knowingly participated in a scheme designed to subvert the rights of Softbank, as well as the Debtor's other creditors. The agreement between the Debtor and EIF (the "EIF Pledge Agreement"), in the form shown to Softbank, was a pledge agreement designed to mesh with terms of the Softbank Payoff Agreement. In the agreement's original form, the Debtor would hypothecate the E*Trade

---

[12] Ashraf admitted in his trial testimony that Softbank was "as eager" as the Debtor to do the transaction in order to obtain partial payment of its claims against the Debtor. Tr 76, 1. 4-6.

7

shares to EIF and permit EIF to re-hypothecate the shares, but it was required that EIF maintain the ability to repossess the stock on five business days' notice. This provision related to the fact that Softbank was pressing for a substantial payment, but the E*Trade stock was declining in value, and no party wanted to sell it at a price that was perceived as low. The Softbank Payoff Agreement and the EIF Pledge Agreement (in its original form) thus gave the Debtor the right to reacquire the stock or its equivalent when the stock reached the price of $6.50 per share, which would provide sufficient proceeds for the Debtor to sell the stock and pay off Softbank, generate additional proceeds to satisfy other creditors and parties in interest, and hopefully retain a balance for itself. EIF breached the re-hypothecation clause when it entered into the STARS transaction with BofA, in effect selling the shares to BofA without any right to reacquire them.[13]

More importantly, EIF and the Debtor's principal, Omar Amanat ("Amanat"), designed the transactions to deceive Softbank and other creditors as to the amount of proceeds and EIF's consideration. The disclosure to Softbank and other creditors was that EIF would "loan" up to $17 million to the Debtor; it was further disclosed that the EIF pledge and BofA "re-hypothecation" would generate proceeds that would permit payment of (i) $11.6 million to Softbank, (ii) approximately $200,000 to certain of the Debtor's most assertive other creditors, and (iii) $162,000 to reimburse EIF for its earlier advance to another creditor. The STARS transaction, ostensibly between EIF and BofA, in fact generated total proceeds of $27.4 million, including a wholly undisclosed balance of approximately $15.5 million. Contractually, the Debtor was obligated by the Softbank Payoff Agreement to pay 16/17ths of the balance to Softbank until the debt was satisfied.

---

[13] At some point, EIF and the Debtor purported to enter into an "amendment" to the EIF Pledge Agreement, which they dated August 20, 2003, deleting the requirement that the shares be re-hypothecated.

8

Instead, EIF, through its principal Ashraf, and Amanat not only failed to disclose that EIF had acquired this surplus, but they also entered into a purported amendment to the EIF Pledge Agreement that forms the basis for EIF's claim to retain the entire $15.5 million.

The initial version of the EIF Pledge Agreement, disclosed to Softbank, contained an interest rate of 8% for EIF's "loan" to the Debtor, and it had no prepayment penalty. Since EIF entered into the STARS transaction almost immediately after the pledge of the shares to it, and since the BofA proceeds were generated almost immediately, EIF's interest earnings in connection with the EIF Pledge Agreement as disclosed would have been nominal. An amended version of the EIF Pledge Agreement, which EIF and the Debtor signed some time after the STARS transaction closed and which was not disclosed to Softbank, provided for a 19% interest rate, extended the term of the EIF "loan" to four years and imposed a prepayment penalty that, if enforced, gave EIF all or most of the $15.5 million. This "pre-payment penalty" allowed EIF to claim millions in damages simply because the Debtor purported to "repay" (i.e., withdraw its own money from) a four-year imaginary "loan."[14]

EIF contends nevertheless that it provided value by assisting the Debtor in deceiving Softbank and subverting Softbank's contractual right to $16/17^{ths}$ of the net proceeds. It appears to take pride in this action, implicitly admitting that it acted in consort with the Debtor to hinder or delay at least one of its creditors. A party does not provide value to an insolvent debtor by helping it conceal assets from a creditor, large or small, secured or unsecured. As discussed in the summary judgment decision, an

---

[14] In its summary judgment decision, the Court invalidated the prepayment penalty as an unenforceable liquidated damages clause under New York law. Moreover, although the prepayment penalty gives EIF a claim to millions of dollars of the STARS proceeds, the record does not contain a clear analysis by EIF as to its claim of right to the full $15.5 million, as the Court has previously found. 376 B.R. at 398 n.7.

9

intentional fraudulent conveyance is a conveyance designed to hinder or delay, as well as to defraud, a creditor. *See*, *e.g.*, *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932).[15]

Nor is EIF aided by the fact that the Debtor's Chapter 11 Trustee and Creditors Committee, on its behalf, brought claims against Softbank during these proceedings. Softbank's settlement of these claims did not constitute an admission that it had acted wrongfully in connection with the Softbank Payoff Agreement or that EIF should be rewarded for subverting Softbank's contractual rights.[16] If the Debtor, which was in obvious financial distress, wished to attempt to avoid the Softbank Payoff Agreement and benefit its creditors other than Softbank, its remedy was not to conceal assets by transferring them to EIF but to file a Chapter 11 petition or take other lawful action. Contrary to its contentions (EIF Reply, dated Jan. 25, 2010, p. 9), EIF provided no value to the Debtor or its creditors even if we assume *arguendo* that this action allowed the Debtor to "stay out of bankruptcy" for a brief period.

EIF's further defense, also reserved for trial, is that it "gave value to the Debtor in good faith by acting as intermediary in connection with the STARS transaction." EIF denigrates the record evidence of Joel Denny, the BofA business representative, cited by

---

[15] The record also shows that efforts were made to harm other creditors as well as Softbank. For example, Amanat showed a principal of Tanzman, Rock & Kaban a document showing a payment to that firm of $1.5 million, without disclosing that there was already a superseding document omitting such payment. At trial Ashraf admitted that he signed multiple versions of the document, one version providing for payment to Tanzman, Rock & Kaban and another version omitting such payment. Tr. 107, 1. 16-17.

[16] EIF never explains how the Debtor's commencement of an adversary proceeding against Softbank would result in the retroactive elimination of Softbank's rights under the Softbank Payoff Agreement. For example, there is no contention that the Debtor's prosecution of claims against Softbank gave rise to a judicial estoppel, nor could there be, as the Debtor's position in the adversary proceeding was not "clearly inconsistent" with its present position and the earlier position did not in any event persuade the Court to take certain action vis-à-vis Softbank. *See Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005); *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005). In fact, this Court dismissed the Debtor's claim in the adversary proceeding that the Softbank Lock-up and Payoff Agreements were the result of actionable duress. *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 400-02 (Bankr. S.D.N.Y. 2007).

the Debtor, that BofA would have entered into the STARS transaction without EIF acting as intermediary.  Instead, EIF cites the concern of BofA's assistant general counsel, Robert Dilworth, described by EIF as Denny's superior, about the trading restrictions on the stock.  (EIF Reply p. 5).  EIF particularly relies on Dilworth's statement that he "took some comfort" from the fact that there was an intermediary such as EIF.  This is a weak reed.  EIF admits (Reply p. 7) that Dilworth had concluded by the time of closing of the STARS transaction that the material restrictions on the STARS shares had been lifted (the record as a whole supports this conclusion).  EIF wholly distorts the record when it asserts, "Only when EIF became involved was a transaction possible, because of EIF's efforts and ability to get the restrictions on the shares lifted."  (EIF Reply p. 7).  As noted above, the record does not contain any credible evidence of EIF's efforts having been material in getting the restrictions lifted, and Denny's testimony is entirely credible.  In any event, the Debtor does not have to show that BofA would have done the deal without EIF to demonstrate that EIF's claimed consideration of $15.5 million is not reasonably equivalent value for acting as the intermediary in a stock sale.[17]

EIF's principal, Ashraf, also testified at the hearing about his experience in the market and suggested that his "contacts" with BofA were important to the closing of the STARS transaction.  The testimony was vague and devoid of any supporting detail or substance.  The record in these proceedings is devoid of evidence that EIF or any of Ashraf's other funds did any substantial business before the challenged transactions – or since then.

---

[17] As one example of a fee for this type of transaction, BofA charged $400,000 for the Collar transaction, which generated $13.2 million in net proceeds.

11

The summary judgment decision finally found that Defendants had raised an issue of fact in connection with a declaration they had obtained from Michael Wimmer, an investment banker that the Debtor had hired in June, 2002, to locate a party who would take the shares as collateral for a loan. The Decision stated, "The Wimmer Declaration supports the proposition that the Defendants contributed some value when they acted as an intermediary in connection with the STARS transaction…. [However,] the issue of value is factual and cannot be determined on this motion." 376 B.R. at 415 (footnote omitted). EIF called Wimmer as a witness at the hearing on November 2, 2009, but Wimmer's testimony does not support EIF's claim to $15.5 million as "value" or "reasonably equivalent value." Based on Wimmer's testimony, it is clear that Wimmer was retained at a time when the shares were in fact restricted and that his assignment on the Debtor's behalf was wholly different from EIF's. Moreover, Wimmer's proposed compensation was far more modest and reasonable than that now claimed by EIF. Based on Wimmer's testimony and the full documentary record, Wimmer's involvement in the Debtor's affairs in 2002 and 2003 provides no support for EIF's contention that it provided any value to the Debtor, and certainly not value "reasonably equivalent" to the $15.5 million in STARS transaction proceeds that it claims.

Good Faith

As the Court held in the summary judgment decision:

> A transferee may be able to defeat the plaintiff's claims by asserting its own good faith and establishing that value was given…. The transferee's "good faith" and value given "in exchange" is an affirmative defense under § 548(c) that the transferee must plead and prove…. Under New York law, there are cases that indicate that the plaintiff has the burden of proving the intent of the transferee as well as the transferor under DCL § 276. On the other hand, in *HBE Leasing v. Frank*, 61 F.3d 1054, 1059, n.5 (2d Cir. 1995) (*"HBE Leasing II"*), the Second Circuit referred only to

> the intent of the transferor in a case under § 276. In any event, it is established under New York law that in an intentional fraudulent conveyance case the relevant inquiry is whether the transferee had either "an actual or constructive knowledge of the fraudulent scheme."

376 B.R. at 403 (citations omitted). Although the above passage was written in connection with intentional fraudulent conveyance claims, § 548(c) provides a defense to both constructive and intentional fraudulent conveyance claims under the Bankruptcy Code. Under New York State law, the issue on a constructive fraud claim is whether the defendant provided "fair consideration" rather than "reasonably equivalent value," but the term "fair consideration" is roughly equivalent and the statute defines it to include the element of good faith. *See* DCL § 272; *Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330 B.R. 362, 363 n.3 (S.D.N.Y. 2005).[18] In constructive fraud cases under the New York DCL, it is the good faith of the transferee that has been held relevant. *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376-77 (S.D.N.Y. 2003); *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 660 (Bankr. E.D.N.Y. 2008).

There is overwhelming evidence in the record of these proceedings that EIF and the Debtor (through Amanat) were acting in bad faith and that both had actual or constructive knowledge of the fraudulent scheme. EIF has not countered evidence that the increased interest rate and the prepayment penalty were not disclosed. The sole support that Ashraf has ever offered for the drastic change in the terms of the EIF Pledge Agreement is that he became more concerned about the risks of the transaction after a

---

[18] DCL § 272 defines fair consideration as consideration given for property, or an obligation,

  a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

  b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

13

telephone conversation with E*Trade representatives. As found in the summary judgment decision, however, EIF never had anything of substance at risk in the transaction other than $162,000 used to pay a secured creditor, which was reimbursed immediately upon closing. In any event, a riskier loan does not justify an extension of the term of the loan from one to four years and an enormous prepayment penalty, which is designed to deter, not encourage, early payment. 376 B.R. at 416-17. The summary judgment decision gave EIF the benefit of every doubt and assumed that Ashraf was telling the truth about his concerns after the phone call with E*Trade. At the hearing on this matter, Ashraf failed to testify on that subject and otherwise failed to provide any credible support for the amendments to the EIF Pledge Agreement.[19]

In their papers, EIF's lawyers attempt to portray Ashraf, the principal of EIF, and Amanat, the Debtor's principal, as "passing business acquaintances," each acting at arm's length.[20] The record does not support the proposition that they were acting as independent parties. As the Court found in the summary judgment decision, Ashraf was deeply involved in many of Amanat's ventures, including one of the Debtor's affiliates, Epoch, a vehicle that Amanat set up for the benefit of his family; for example, Ashraf was the sole trustee of the trust which was the general partner of Epoch until October 8, 2003. *See* 376 B.R. at 411; *see also In re Market XT Holdings Corp. and In re Epoch*

---

[19] Ashraf did not, for example, dispute the finding on summary judgment that Amanat was listening in on the phone call with E*Trade, prompting Ashraf by email as to what he should say. *See also* 336 B.R. at 46 (decision on contempt).

[20] In its papers on these proceedings, EIF disparages Amanat and an affidavit relied on in the summary judgment decision and asserts, "[T]he only evidence of any alleged 'fraudulent intent' is the repudiated affidavit of an absconded debtor who plaintiffs themselves have characterized as a dishonest man." (Reply p. 4). EIF's rhetoric falls short of helping its case. First, the Court's reasons for crediting the affidavit are set forth in the summary judgment decision and will not be repeated here. Second, the record contains unrebutted evidence as to the existence of many of the badges of fraud that are alone sufficient to find fraudulent intent to hinder, delay, and defraud creditors. 376 B.R. at 405-411.

*Invs., L.P.*, 2007 WL 680763 at *3 n.7 (Bankr. S.D.N.Y. March 1, 2007). [21] There is no doubt that the two were working closely together, and nothing in Ashraf's testimony provided material support for EIF's version of events. Ashraf has previously admitted that he filed false papers with this Court in connection with this adversary proceeding. *See* letter dated May 9, 2006 from Rauf Ashraf to the Court (Docket No. 188); *see also* Tr. of Hearing of May 5, 2006 (Docket No. 191), pp. 8-14. Ashraf and EIF have also been held in contempt for having transferred $6.7 million to Amanat's cousin in Canada in violation of a Court order. *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 336 B.R. 39 (Bankr. S.D.N.Y. 2006). EIF did not sustain the defense that it was acting in good faith, within the meaning of § 548(c) of the Bankruptcy Code, and to the extent the burden was on Plaintiffs to establish lack of fair consideration under § 273 of the DCL, and to establish that "the transferee had either actual or constructive knowledge of the fraudulent scheme," the record demonstrates clearly and convincingly that they sustained such burden.[22]

---

[21] That decision overruled an objection to a claim that EIF had filed in the bankruptcy proceedings of Epoch, an affiliate of the debtor herein. The claim objection was denied on the basis, *inter alia*, that "there were many different business relationships between Amanat and Ashraf and the companies they controlled, a close relationship between the two men, and a frequent transfer of funds back and forth between the companies…. Ashraf was in effective control of Epoch until the fall of 2003…. Even later Ashraf continued to work closely with Amanat." 2007 WL 680763 at *4, *5.

[22] EIF's lack of good faith also prevents it from claiming even nominal consideration for its role in the STARS transaction, or setting off against the transactions avoided by Plaintiffs a few miscellaneous costs it asserts it incurred in connection with the EIF Pledge Agreement, such as its attorney's fees. A party relying on "value" as a defense in a fraudulent conveyance case must also act in good faith. Bankruptcy Code § 548(c); DCL § 272. Since there was no good faith on EIF's part, it cannot sustain the defense of value in any amount. Moreover, only a "good faith transferee" may assert a lien on the transferred property for preservation of the property or similar benefits provided. 11 U.S.C. § 550(e). Even assuming that legal fees could be considered "improvements" within the meaning of § 550(e), the record demonstrates that EIF was not a good faith transferee.

15

CONCLUSION

Plaintiffs are directed to settle a judgment avoiding the proceeds of the STARS transaction as intentional and constructive fraudulent conveyances. Since Plaintiffs have sustained a claim of intentional fraudulent conveyance under State as well as Federal law, they appear entitled to attorney's fees under §276-a of the DCL, and there is authority that they are entitled to interest. *See* 376 B.R. at 426. If interest or attorney's fees are requested, they should be supported in detail.

Dated: New York, New York
       Mach 12, 2010

                                        */s/ Allan L. Gropper*
                                        UNITED STATES BANKRUPTCY JUDGE